[No. 75263-0.   En Banc.]
Argued November 15, 2005.      Decided June 8, 2006.

*In the Matter of the Custody of* SHIELDS.

JENNY SHIELDS, *Respondent,* v. SUSAN
HARWOOD, *Petitioner.*

*Gary R. Stenzel* (of *Gary R. Stenzel, P.S.*), for petitioner.
*Lee R. McGuire, Jr.*, for respondent.

¶1 MADSEN, J. — C.W.S. was removed from his mother's home in 2003 when the trial court awarded custody to his stepmother. Petitioner Susan Harwood (mother) is challenging the Court of Appeals' decision affirming the trial court's order awarding custody of her son to Respondent Jenny Shields (stepmother). Harwood argues that Shields lacked standing to bring this nonparental custody action, that under chapter 26.10 RCW, nonparental actions for child custody, a court may award custody of a child to a nonparent in a custody dispute between a parent and a nonparent only if a parent having physical custody of the child is "unfit," and that the trial court abused its discretion when the court erroneously applied the "best interests of the child" standard in making its custody decision.

¶2 We hold that Shields has standing and that under chapter 26.10 RCW, a court may award custody of a child to a nonparent in a proceeding against a parent if a parent is either unfit or if placement with that parent would result in actual detriment to the child. Under the detriment standard the nonparent has a heightened burden to establish that actual detriment to the child's growth and development will occur if the child is placed with the parent, consistent with the constitutional mandate of deference to parents in these circumstances. We also hold that the trial court abused its discretion by erroneously applying the "best interests of the child" standard in determining the

custody of C.W.S. Accordingly, we reverse and remand to allow the trial court to apply an actual detriment standard.

## FACTS

¶3 Susan Harwood and Michael Shields were married on May 12, 1989. C.W.S., their only child, was born on November 14, 1990. Harwood and Michael Shields divorced on September 6, 1994, when C.W.S. was three years old. By agreement between the parents, and under the terms of the parenting plan, C.W.S. was to reside primarily with his father, Michael Shields. His mother, Harwood, was granted liberal visitation. C.W.S. was to spend alternating holidays, all spring vacation, and a majority of summer vacation with his mother. Additionally, C.W.S. was to spend each parent's vacation with that parent each year. All major decisions regarding C.W.S., including educational decisions, nonemergency health care, and religious upbringing were to be made jointly between Harwood and Michael Shields. After the divorce, Michael Shields continued to help support Harwood, including paying for her automobile so she could continue to visit her son.

¶4 On July 6, 1996, Michael Shields married Jenny Wisecarver. Jenny's daughter was eight years old at the time of the wedding. Michael Shields adopted her on June 30, 1997.

¶5 In fall 1996, Harwood moved to Willamina, Oregon, approximately 375 miles from the Shieldses' home in Lamont, Washington, and later married Kurt Harwood. Prior to her marriage, Harwood did not utilize a significant portion of her visitation. For example, Harwood did not have C.W.S. reside with her during the summers of 1995 and 1996.

¶6 In May 1997, the court ordered a new parenting plan. Under this plan, Harwood's monthly visitation was reduced to one weekend a month, to take place near Lamont, Washington, so that C.W.S. would not have to travel. As part of the new parenting plan, an order of child support

was also entered, requiring Harwood to contribute for C.W.S.'s upbringing. The net support obligation was determined to be $112.20 but was reduced to $25.00 per month to avoid dropping Harwood below the basic need standard based on her inability to pay.

¶7 Between 1997 and 2001, C.W.S. resided with Harwood in Oregon during all but one of the scheduled visitations, consisting of portions of Christmas break, spring break, and summer vacation. In December 2000, C.W.S. was ill during his scheduled Christmas break and was thus not able to travel to Oregon to visit Harwood. During this time, C.W.S. resided with Harwood in Oregon approximately four weeks a year. Due to her job and the significant distance between the two families, Harwood visited C.W.S. in Washington approximately 15 percent of the time for her monthly weekend visits provided in the parenting plan. Harwood and C.W.S. had limited and sporadic phone contact. In 1999, Michael and Jenny Shields had a child.

¶8 On August 11, 2001, when C.W.S. was 10 years old, Michael Shields died in a bizarre accident at home. Harwood learned of Michael Shields' death on Sunday, August 12, 2001, and phoned the Shieldses to inform them that she intended to pick up C.W.S. and bring him to her home in Oregon. Prior to Michael Shields' funeral, Harwood and her husband drove to Lamont to arrange to bring C.W.S. to Oregon. There is some dispute as to whether Harwood intended to allow C.W.S. to attend his father's funeral. Harwood claims she always planned for C.W.S. to attend the funeral. Jenny Shields and other relatives in Michael Shields' family claim that Harwood had to be convinced to wait until after the funeral to take C.W.S. to Oregon.

¶9 The day after the funeral, Harwood requested that Jenny Shields bring C.W.S. to a neutral location in Sprague, Washington, but Shields refused, resulting in Harwood's driving to the Shieldses' family farm to pick up her son. In the few days between C.W.S.'s father's death and his mother's resumption of custody, Jenny Shields had C.W.S.

and his two siblings attend bereavement counseling in Spokane.

¶10 C.W.S. lived with Harwood and her husband from August 2001 until January 2003. The Harwoods live on a farm in Willamina, Oregon, where they raise horses. C.W.S. had his own horse, a gelding named Chocolate. Harwood is employed as a cashier at a casino and Kurt Harwood is a truck driver. After C.W.S. arrived in Oregon, Harwood arranged to have him meet with Jeri Lee Merkle, a clinical social worker specializing in bereavement counseling. Over the course of 14 months, C.W.S. met with Merkle 31 times. Ten of the 31 sessions consisted of private therapy sessions between Merkle and C.W.S. Six of the 31 sessions consisted of private therapy sessions with Merkle, C.W.S., and Harwood present or with Merkle, C.W.S., Harwood, and Kurt Harwood present. In the remaining 15 sessions, Merkle and another therapist met with C.W.S. and other children as part of a group bereavement therapy program.

¶11 While in Oregon, C.W.S. did well in school, was elected class president, and joined the football team at his school. C.W.S. also tested into the talented and gifted program.

## PROCEDURAL HISTORY

¶12 On August 21, 2001, Jenny Shields (hereinafter Shields) filed a nonparental custody petition pursuant to RCW 26.10.030(1) claiming that Harwood was not a suitable custodian for C.W.S. In the petition, Shields also requested child support modification and that reasonable visitation be awarded to Harwood.

¶13 Shields claimed in the petition that C.W.S.'s best interests would be served by staying in the family home in Lamont where he had spent the six years prior to the filing of the petition with Shields. According to Shields, C.W.S. has close ties with his siblings as well as other family and

friends in Lamont, has attended school his entire life in Lamont, and loved the family farm.[1]

¶14 On December 5, 2001, a pretrial hearing was held. Shields' counsel requested that a guardian ad litem be appointed to assess Harwood's fitness, relying on *In re Custody of Nunn*, 103 Wn. App. 871, 14 P.3d 175 (2000). Harwood's counsel, also relying on *Nunn*, requested that the nonparental custody petition be dismissed because there was no evidence that Harwood was unfit. At the conclusion of the hearing, the judge appointed a guardian ad litem to make an initial investigation. The guardian ad litem was to determine whether or not the biological mother was unfit and, if so, whether there was a possibility of harm to the child.

¶15 On April 15, 2002, at the guardian's request, the judge expanded the guardian ad litem's duties, authorizing him to investigate and explore the appropriateness of C.W.S.'s placement with Shields and C.W.S.'s siblings and with Harwood. The guardian was granted access to all counselors, psychologists, psychiatrists, and medical doctors for Shields, Harwood, and the children in each household. The guardian was also authorized to visit each residence and to receive copies of all school records for C.W.S.

¶16 The guardian ad litem submitted his report on October 18, 2002, in which he recommended that C.W.S. be allowed to primarily reside with his half-brother, stepsister, and stepmother, Shields, at their residence in Lamont, Washington, with reasonable visitation with his mother, Harwood, and stepfather, Kurt Harwood, in Oregon. The guardian ad litem based his conclusions primarily on the fact that between Harwood and Shields, Shields has been the primary residential parent since C.W.S. was five years old; C.W.S. is closely bonded with Shields, his psychological parent, and is less bonded to his mother; C.W.S. wished to reside with Shields and his siblings; and

---

[1] Shields does not claim that she is a de facto parent, entitling her to the constitutional protections and the rights and obligations of a parent. *See In re Parentage of L.B.*, 155 Wn.2d 679, 708-09, ¶ 41, 122 P.3d 161 (2005) (a de facto parent stands in legal parity with an otherwise legal parent).

while in Oregon, C.W.S. had limited contact with his family in Washington.[2] Additionally, the guardian ad litem stated that Dr. Frank Hamilton, who had seen C.W.S. a few times with Shields and C.W.S.'s siblings present, identified "a potential problem appears just waiting to happen of a serious magnitude as [C.W.S.] stands at the threshold of adolescence and enters the time when many adolescents begin a period of rebellion or obstructive behavior." Clerk's Papers (CP) at 208. According to the guardian ad litem, this problem

> can take a variety of forms but it is more likely [C.W.S.] would act out with anger and frustration in the home in Oregon than he is likely to act out in Lamont. While one cannot guarantee there will or will not be anger or rebellion problems it seems more likely than not this will be a problem if [C.W.S.] remains placed with his biological mother in Oregon.

CP at 208.[3]

¶17 At the trial, five people testified: Harwood, Kurt Harwood, Shields, Dennis Cronin (the guardian ad litem), and Merkle, C.W.S.'s therapist from Oregon. The judge also had a private, recorded conversation in his chambers with C.W.S. Merkle provided extensive testimony at the trial regarding her 31 sessions with C.W.S. in Oregon and other follow up discussions with C.W.S. via the telephone.

¶18 Merkle, a clinical social worker with almost 20 years of experience and a specialist in bereavement counseling, explained that initially C.W.S. was adamant that he did not

---

[2] The guardian ad litem, who was also an attorney, also provided in his not some "conclusions of law" to support his recommendation. Without any citation to legal authority, he said that C.W.S. has "an associational constitutional right under the State and Federal Constitutions to maintain contact with persons with whom he has established a significant and substantial parent like relationship" and "sibling relationship." Clerk's Papers (CP) at 208. He then cited *In re Marriage of Little*, 26 Wn. App. 814, 614 P.2d 240 (1980), for the proposition that the court "should be hesitant except for compelling circumstances to separate siblings." CP at 208. That decision was reversed by this court in *In re Marriage of Little*, 96 Wn.2d 183, 634 P.2d 498 (1981).

[3] The cause of this potential problem is not completely clear, however; Merkle, C.W.S.'s therapist in Oregon, testified that the root cause of serious psychological damage in adolescence would be C.W.S.'s reaction when he learns of the details of his father's death.

want to live in Oregon and wanted to live in Washington with his stepmother and siblings. Early on, according to Merkle, C.W.S. viewed his living in Oregon as clearly temporary. In clinical settings he would not do activities that were around "family constellations," and at the Harwoods he chose one of the smallest rooms in the house. Merkle noted that C.W.S. referred to both Harwood and Shields as "mom." She stated that C.W.S. had a close emotional attachment with Shields and a lesser attachment with Harwood. Early in treatment, she encouraged Harwood to allow C.W.S. contact and visitation with Shields and his siblings. For one month, Harwood banned C.W.S. from using the phone due to misbehavior, resulting in C.W.S.'s being unable to contact Shields by telephone, although he was able to use e-mail. Merkle informed Harwood of the consequences of that restriction, and Harwood then allowed C.W.S. to use the phone. While staying in Oregon, C.W.S. visited Lamont a few times, including during spring break of 2002 and for five weeks in summer 2002.

¶19 Merkle stated that she had seen progress in C.W.S. while he was living in Oregon. Merkle testified that C.W.S. has gone through one of the critical stages of grief work, which is reestablishing what it is to be normal after one's life is turned upside down by a death of a parent. Merkle noted that C.W.S. had a good relationship with his stepdad, Kurt Harwood. She stated that she thought that C.W.S. had been highly bonded and attached to his biological father, so that having contact with another male was a comfortable experience for C.W.S. Merkle testified that at the time of the trial, C.W.S. was beginning to recognize Willamina as his home in addition to his former home in Washington. From her observations of the Harwood family and from the work done with C.W.S., Merkle stated that although the Harwood's household was rather chaotic with C.W.S. experiencing ups and downs, she did not believe that living with Harwood and Kurt Harwood would negatively impact C.W.S.

¶20 During part of the testimony the courtroom was cleared of spectators in order to discuss the sensitive circumstances of Michael Shields' death. Merkle agreed with the part of the guardian ad litem's report that indicates that C.W.S. is likely to have a difficult time in adolescence when he learns further about the details of his father's death. According to Merkle, C.W.S. perceived his father as a hero. Merkle claimed that the learning process is likely going to be "horrendous" because it will likely be a tremendous confrontation of disillusionment. Verbatim Tr. of Proceedings at 112. Merkle claims that the degree the process affects his development will depend on when he learns of the information (e.g., at 12 years of age versus at 25 years of age).

¶21 C.W.S. testified in the private chambers interview that living in Oregon with Harwood and Kurt Harwood was "okay," and better than it was when he first went down there because he had more friends at school and has adjusted but that he would rather live in Washington because that is where his brother and sister are, where the farm is, and where it feels like home. In-chambers Verbatim Tr. of Interview (Nov. 21, 2002) at 5-8. C.W.S. also discussed his activities and relationships with his cousins who live nearby in Washington.

¶22 After a two-day trial, the court granted Shields' petition and awarded custody to Shields, a nonparent. C.W.S. was ordered to move back to Lamont, Washington, to live with Shields and his siblings at the semester break from his school in order to minimize disruption to his school schedule. He has remained in Washington during the appeal of this case.

¶23 In ordering nonparental custody to Shields, the court explained in its memorandum decision that "[i]n spite of the fact that the 'best interests of the child standard' . . . is insufficient to overcome the constitutional right of the parent to rear his or her child," the court nevertheless thought it appropriate to "consider and weigh the facts set forth in

RCW 26.09.190 in evaluating the totality of the circumstances presented by the case at bar." CP at 246.

¶24 In making its decision, the court first concluded that Harwood was a fit parent, an issue that was not in dispute between the parties. The court then pointed to the fact that C.W.S. wished to stay in the family home with Shields and his siblings, that C.W.S. had a long-standing interrelationship with Shields, his siblings, and his extended family in Washington; that C.W.S.'s adjustment to his home in Oregon has been guarded, that he was less bonded to Harwood than with Shields, and that C.W.S.'s mental health and his future development in adolescence is at risk if he remains in Oregon. He also concluded that Shields, her two children, and C.W.S. consisted of a de facto family.

¶25 The court concluded that "in weighing all the factors ... there has been a showing of actual detriment to [C.W.S.] should he be allowed to continue to reside in Oregon in a situation which is, in effect, against his will." CP at 248. He concluded that "[t]he totality of the circumstances dictate" that C.W.S. should be returned to his stepmother, Shields, in Washington. *Id.* The court said it found no "compelling" reason to separate C.W.S. from his half-siblings, *id.*, citing as authority for this "compelling reason" standard, *In re Marriage of Little*, 26 Wn. App. 814, 816-17, 614 P.2d 240 (1980), *rev'd*, 96 Wn.2d 183, 634 P.2d 498 (1981), and *Smith v. Frates*, 107 Wash. 13, 16, 180 P. 880 (1919), *modified by Frates v. Frates*, 135 Wash. 567, 238 P. 573 (1925). The court also reasoned that a child has an "independent, constitutionally guaranteed right to maintain contact with a person with whom the child has developed a parent-like relationship," citing *Webster v. Ryan*, 189 Misc. 2d 86, 729 N.Y.S. 2d 315 (2001), *rev'd sub nom. In re Harriet II*, 292 A.D.2d 92, 740 N.Y.S.2d 162 (2002). CP at 245.

¶26 The trial court recommended that C.W.S. continue his counseling as deemed necessary by Dr. Hamilton in consultation with Merkle. The trial court ordered that Harwood be allowed visitation "in the same manner and

times as previously ordered by the court" and concluded that child support was not necessary because of continued Social Security benefits payable to C.W.S.'s representative.

¶27 The Court of Appeals affirmed the trial court's nonparental custody decree in a split decision. Judge Kurtz, with Chief Judge Brown in concurrence, reaffirmed their agreement with *In re Marriage of Allen*, 28 Wn. App. 637, 626 P.2d 16 (1981), concluding that a court may award custody of a child to a nonparent if the parent is either an unfit parent or if placement of the child with an otherwise fit parent would result in "actual detriment" to the child. *In re Custody of Shields*, 120 Wn. App. 108, 122-26, 84 P.3d 905 (2004). Under this *Allen* standard, the court must use a heightened standard of review, requiring a greater burden of proof by the nonparent, more than a preponderance of the evidence required under the "best interests of the child" standard. In a dissent, Judge Sweeney disagreed and concluded that a court may not consider a nonparent custody petition without a preliminary determination that a well-founded allegation of unfitness has been pleaded, *id.* at 131-36 (citing *Nunn*, 103 Wn. App. 871; *In re Welfare of Hudson*, 13 Wn.2d 673, 126 P.2d 765 (1942)).

¶28 Harwood petitioned this court for review, which was granted, pending the decision in *In re Parentage of C.A.M.A.*, 154 Wn.2d 52, 109 P.3d 405 (2005), a case involving grandparent visitation. This court requested additional briefing on *C.A.M.A.* prior to oral argument, which both parties have provided.

## ANALYSIS

¶29 Under RCW 26.10.030(1), a person other than a parent (a nonparent) may petition for custody of a child "by filing a petition seeking custody of the child in the county where the child is permanently resident or where the child is found, but only if the child is not in the physical custody of one of its parents or if the petitioner alleges that neither parent is a suitable custodian."

¶30 In this case, it is undisputed that Shields filed her petition in the correct county and alleged that Harwood was not "suitable."

¶31 Nonetheless, Harwood claims that there is an additional substantive, nonstatutory standing condition, which Shields has not met. Specifically, Harwood maintains that Shields was required to allege that Harwood is "unfit." Absent this allegation or proof at trial, Harwood argues that this case should be dismissed. Harwood relies primarily on one case, *Nunn*, 103 Wn. App. 871.

¶32 In *Nunn*, a nonparent (an aunt) brought a custody action under RCW 26.10.030 and alleged that the parent (the child's mother) was unfit. The aunt brought the action at the child's father's request two days before the father died. *Id.* at 875. Prior to his death, the father set up a trust to benefit his son and to pay the aunt's legal bills to obtain custody of his son. *Id.* The parents had divorced when the child was two. *Id.* at 874. During the 10 years before the custody proceeding, the father had primary custody of the child. *Id.* at 874-75. By the time of the trial, the mother had unsupervised overnight residential visitation two to three days per week. *Id.* at 874. At trial, it was demonstrated that the allegations supporting the unfitness claim, that the mother was an active alcoholic and prostitute, were not true. *Id.* at 873. However, the trial court awarded custody to the nonparent, concluding that the mother was unfit primarily because of her history of instability and unemployment and the hostility the mother showed during the litigation to the opposing side in the custody proceeding, alienating the child from his father's family and support group. *Id.* at 877-82.

¶33 The Court of Appeals held that the aunt did not have standing because she did not produce substantial evidence to support her allegation of parental unfitness. *Id.* at 883. According to the court, "a nonparent lacks standing to seek custody of a child as against a fit parent having physical custody." *Id.* at 882. The court noted that although RCW 26.10.030(1) requires in part that a petitioner provide an

allegation to the court that neither parent is a "suitable custodian," the statute must be interpreted to mean that a nonparent lacks standing to seek custody of a child against a fit parent having physical custody of the child. *Id*. This interpretation, the court said, was required by the deference accorded to parental rights and the limited circumstances in which the State can intrude upon a family's integrity. *Id*. The court cited *Allen*, 28 Wn. App. at 646 (deference is accorded to parental rights under the constitution and to protect the family) and *In re Custody of Smith*, 137 Wn.2d 1, 969 P.2d 21 (1998) (providing that intrusion is justified only in case of harm to the child), *aff'd on narrower grounds sub nom. Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). Because standing does not exist against a fit parent, a petitioner must provide substantial evidence to support the allegation. *Nunn*, 103 Wn. App. at 883. Thus, the court held that the aunt lacked standing because she did not produce substantial evidence as to the mother's unfitness. *Id*. By deciding the case in this manner, the court did not reach the merits of the mother's claim that the "best interests of the child" standard used by the trial court was unconstitutional. *Id*. at 874 n.1.

¶34 Shields claims that *Nunn* does not control in this case because it dealt only with allegations of parental "unfitness" and not with allegations of detriment to the child. Accordingly, Shields maintains that *Nunn* should be read narrowly and should not apply when a nonparent alleges that placement of the child with an otherwise fit parent will result in detriment to the child. The Court of Appeals agreed with Shields, holding that she had standing.

¶35 Standing to bring an action for custody of a child by a nonparent is governed by statute. *See, e.g., In re Custody of R.R.B.*, 108 Wn. App. 602, 607, 31 P.3d 1212 (2001) (holding that under RCW 26.10.030(1), standing requirements are contained in the statute) (citing *Smith*, 137 Wn.2d 1; *In re*

*Marriage of Farrell*, 67 Wn. App. 361, 835 P.2d 267 (1992). The meaning of a statute is inherently a question of law and our review is de novo. *In re Parentage of J.M.K.*, 155 Wn.2d 374, 386-87, ¶ 23, 119 P.3d 840 (2005) (citing *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 142 Wn.2d 543, 555, 14 P.3d 133 (2000); *Dioxin/Organochlorine Ctr. v. Pollution Control Hearings Bd.*, 131 Wn.2d 345, 352, 932 P.2d 158 (1997)). The primary goal of statutory interpretation is to ascertain and give effect to the legislature's intent and purpose. *Am. Cont'l Ins. Co. v. Steen*, 151 Wn.2d 512, 518, 91 P.3d 864 (2004); *Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002).

¶36 RCW 26.10.030(1) does not support the standing requirement enunciated in *Nunn*. The statute requires that the petitioner allege that neither parent is a "suitable" custodian; it does not say a "fit" custodian. The court in *Nunn* was understandably frustrated with the length and duration of the proceedings as well as the outcome of the trial. That case involved a five-day trial and months of hostility between the parties while the case was pending. But the court's real concern was that the wrong legal standard had been applied—that the trial court awarded custody to a nonparent when there was no evidence that the parent could not properly parent the child. Rightly so. However, the court misdirected its concern and set up a substantive standing requirement, which is really a concern about the merits.[4] As discussed below, the way to deal with this concern is to apply a heightened legal standard; more than the "best interests of the child" standard is required in a case involving a parent and a nonparent.

---

[4] The court in *Nunn* said that its ruling "makes it unnecessary that we address [the mother's] contention that Washington's nonparental child custody statute unconstitutionally infringes on the fundamental right of parents to make decisions concerning the care, custody and control of their children in violation of the state and federal constitutions because it allows a court to deprive a parent of custody in favor of a nonparent under the 'best interests of the child' standard without requiring the court to accord the parent (1) a presumption of fitness, and (2) deference to the parent's decisions regarding the child's best interests." *Nunn*, 103 Wn. App. at 874 n.1.

¶37 In this case, it is undisputed that Shields filed in the correct court and properly alleged Harwood was not suitable. Accordingly, we hold that Shields has standing and, to the extent *Nunn* holds that there are requirements for standing separate from the statute, RCW 26.10.030, it is reversed.[5]

¶38 Next, Harwood claims that under chapter 26.10 RCW, Shields must show that Harwood is "unfit" in order to grant a nonparent custody petition. Because Shields did not prove that Harwood was unfit, Harwood argues that this court should reverse the custody order. The primary authority supporting her position is *Nunn*, 103 Wn. App. 871, discussed above.

¶39 In response, Shields argues first that the statute does not say "unfit." Second, Shields points to cases in which courts have held that custody of a child may be awarded to a nonparent if a parent is unfit or if placement of the child with an otherwise fit parent would result in actual detriment to the child. She points to *Allen*, 28 Wn. App. 637; *In re Custody of Stell*, 56 Wn. App. 356, 783 P.2d 615 (1989); and *R.R.B.*, 108 Wn. App. 602.

¶40 In *Allen*, the court awarded custody to a nonparent, the stepmother. The child in that case was born deaf and needed a special environment both at home and at school in order to develop and grow. *Allen*, 28 Wn. App. at 640-41. The father had limited signing ability and could not effectively communicate with the child. *Id.* at 641. In contrast, the stepmother (and her three children) were fluent in sign language, and the stepmother was heavily involved in the child's special educational environment. *Id.* at 641-42. The

---

[5] In 2003, chapter 26.10 RCW was amended by the legislature and now requires a court to have a show cause hearing in order for a nonparental action for child custody to proceed. LAWS OF 2003, ch. 105, § 3. Now, under RCW 26.10.032(1), a nonparent seeking a custody order must submit, along with his or her motion, an affidavit declaring that the child is not in the physical custody of one of his or her parents or that neither parent is a suitable custodian and to set forth the facts supporting the requested order. The court must deny the nonparent's motion unless it finds that "adequate cause" for hearing the motion is established by the affidavits. RCW 26.10.032(2). If adequate cause is found, the court then sets a date for a hearing on an order to show cause why the requested order should not be granted. *Id.*

trial court awarded custody to the stepmother using a "best interests of the child" standard, which examines the totality of the circumstances and gives equal weight to each household. *Id.* at 645-46.

¶41 On appeal, the Court of Appeals held that the "best interests of the child" standard was unconstitutional as between a parent and a nonparent because it did not give the required deference to parental rights. *Id.* at 646. The court explained that the best interests of the child standard is proper when determining custody between parents, but "between a parent and a nonparent, application of a more stringent balancing test is required to justify awarding custody to the nonparent. Great deference is accorded to parental rights, based upon constitutionally protected rights to privacy and the goal of protecting the family entity." *Id.* at 645-46. "Parental rights are balanced by the State's interest as parens patriae in the child's welfare and parents' rights may be outweighed when these interests come into conflict." *Id.* at 646 (citations omitted). The court stated that:

> "Although the family structure is a fundamental institution of our society, and parental prerogatives are entitled to considerable legal deference, they are not absolute and must yield to fundamental rights of the child or important interests of the State."

*Id.* (quoting *State v. Koome*, 84 Wn.2d 901, 907, 530 P.2d 260 (1975)). The court in *Allen* found that the State may interfere with a parent's constitutional rights in only two instances.

¶42 First, parental rights may be outweighed when a parent is unfit. *Id.* at 646. If a parent's actions threaten the child's welfare, the State's interest in protecting children takes precedence. *Id.* An unfit parent generally cannot meet a child's basic needs and, in such cases, the State is justified in removing the child from the home and, in certain cases, permanently terminating parental rights. *Id.* (examples of unfitness include the fault or omission by the parent seriously affecting the welfare of a child, pre-

serving of the child's right to freedom from physical harm, illness or death, or the child's right to an education).[6] Second, parental rights may also be outweighed in custody determinations when actual detriment to the child's growth and development would result from placement with an otherwise fit parent. *Id.*[7]

¶43 In *Allen*, it was undisputed that the parent, a father, was a fit parent. Nevertheless, the court affirmed, explaining that

> [i]n extraordinary circumstances, where placing the child with an otherwise fit parent would be detrimental to the child, the parent's right to custody is outweighed by the State's interest in the child's welfare. There must be a showing of actual detriment to the child, something greater than the comparative and balancing analyses of the "best interests of the child" test. Precisely what might outweigh parental rights must be determined on a case-by-case basis. But unfitness of the parent need not be shown.

*Allen*, 28 Wn. App. at 649.

¶44 Harwood urges this court to reject the heightened standard set forth in *Allen*, citing *Troxel*, 530 U.S. 57. Harwood claims that *Troxel* stands for the proposition that "state courts do not have the right to interfere with a parent's custody unless the parent is unfit." Pet. for Review at 6.

¶45 Harwood is incorrect. The plurality opinion in *Troxel* holds that in order for a court to interfere with a fit parent's parenting decisions, a court must "accord at least some special weight to the parent's own determination." *Troxel*, 530 U.S. at 70. Thus, in the context of visitation, the "best interests of the child" standard was insufficient because it

---

[6] *See, e.g.*, ch. 13.34 RCW (Juvenile Court Act—Dependency and Termination of Parent-Child Relationship); RCW 26.44.010 (in instances of nonaccidental injury, neglect, death, sexual abuse, and cruelty to children by their parents the State is justified in emergency intervention).

[7] The court noted that a custody determination is a less drastic limitation on parental rights than the dependency or abuse and neglect situations involving parental unfitness determinations. *Allen*, 28 Wn. App. at 647 n.7.

contravened the traditional presumption that a fit parent will act in the best interest of his or her child. *Id.* at 69-70. As this court recently reaffirmed in *C.A.M.A.*, state interference with a fit parent's fundamental right to autonomy in child-rearing decisions is subject to strict scrutiny. *C.A.M.A.*, 154 Wn.2d at 60-61, ¶ 16 (citing *Smith*, 137 Wn.2d at 13). Interference is justified only if the State can show that it has a compelling interest and such interference is narrowly tailored to meet the compelling state interest involved. *C.A.M.A.*, 154 Wn.2d at 61, ¶ 16 (citing *Smith*, 137 Wn.2d at 15); *In re Parentage of L.B.*, 155 Wn.2d 679, 710, ¶ 44, 122 P.3d 161 (2005) (explaining that *C.A.M.A.* reaffirmed *Smith*'s strict scrutiny analysis). In *C.A.M.A.* and *Smith*, we found certain grandparent visitation statutes unconstitutional in part because they did not require a showing of harm to the child in order to disturb a fit parent's parenting decision.

¶46 When applied properly, we hold that the actual detriment standard is constitutional. The State has a compelling interest in protecting children's welfare, *R.R.B.*, 108 Wn. App. 602, and the remedy is narrowly tailored to meet the State's interest. Under the heightened standard, a court can interfere with a fit parent's parenting decision to maintain custody of his or her child only if the nonparent demonstrates that placement of the child with the fit parent will result in actual detriment to the child's growth and development. The court in *Allen* rejected the "best interests of the child" standard because it did not provide proper deference to a fit parent. *See R.R.B.*, 108 Wn. App. 602, (holding that RCW 26.10.100, as modified by the *Allen* court, is constitutional because the State has a compelling interest in protecting children's welfare; that the statute recognizes the presumption that a fit parent will act in a child's best interest; and that the remedy is narrowly tailored to further the State's interest); *Stell*, 56 Wn. App. 356 (the test adopted by the *Allen* court acknowledges the right to privacy implicated in custody disputes and establishes a test which is sensitive to the parent's rights and needs of a child).

¶47 As the Court of Appeals noted below, when this heightened standard is properly applied, the requisite showing required by the nonparent is "substantial," *Shields*, 120 Wn. App. at 123, and a nonparent will generally be able to meet this test in only "extraordinary circumstances." *Allen*, 28 Wn. App. at 649. *See, e.g., R.R.B.*, 108 Wn. App. 602 (nonparent met burden of establishing actual detriment in case of a suicidal child suffering from bipolar stress disorder and posttraumatic stress disorder; child required extensive therapy and stability at the level the parents could not provide); *Stell*, 56 Wn. App. 356 (nonparent met burden of establishing actual detriment in the case of a child who had been physically and sexually abused while young; child required extensive therapy and stability at the level the parent could not provide). *See also In re Custody of Anderson*, 77 Wn. App. 261, 890 P.2d 525 (1995) (the nonparent failed to meet burden of showing actual detriment because loss of opportunities for child in nonparents' home was not sufficient to show actual detriment to the child).[8]

¶48 Although we approve the actual detriment standard articulated in *Allen*, we are concerned with references in that opinion to the concept of a "de facto family." In *Allen* the court found that the nonparent, her children, and the child consisted of a "de facto family" and that in such a case, "custody *might* lie with a nonparent." *Allen*, 28 Wn. App. at 648 (emphasis added). As we recently stated in *L.B.*, incautious use of terms such as psychological parent, in loco parentis, and de facto parent has led to great confusion. *L.B.*, 155 Wn.2d at 691 n.7. In *L.B.* we held that in order for a court to give legal effect to a de facto parent, the court must find that (1) the natural or legal parent consented to and fostered the parent-like relationship; (2) the petitioner

---

[8] Harwood also points this court to *In re Custody of Brown*, 153 Wn.2d 646, 654, ¶ 14, 105 P.3d 991 (2005), which states, "[i]f a nonparent is petitioning the court for custody of a child in the physical custody of a parent, RCW 26.10.030 requires the court to find that parent unfit before disturbing the custody arrangement." However, no authority was provided for the statement. Furthermore, the statement was dicta because that case involved a custody dispute between two nonparents.

and the child lived together in the same household; (3) the petitioner assumed obligations of parenthood without expectation of financial compensation; (4) the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship, parental in natural. *Id.* at 708, ¶ 40. Additionally, recognition of a de facto parent is "limited to those adults who have fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life." *Id.* (citation omitted). We found that recognizing a de facto parent that met the above criteria did not impermissibly interfere with a parent's constitutionally protected rights in part because of the critical showing that the parent "consented to and fostered" the parent-child relationship. *Id.* at 712, ¶ 47. Contrary to the suggestion in *Allen*, this court has not recognized "de facto family" as a legal status.

¶49 Next, we turn to Harwood's assertion that the trial court impermissibly placed the evidentiary burden on her to prove that custody with Harwood would be in C.W.S.'s best interests.

¶50 Harwood is correct. Although the trial court referred to the actual detriment standard, the record reflects that it applied the "best interests of the child" standard. As a result, the trial court failed to accord Harwood the benefit of the presumption that placement of C.W.S. with her, a fit parent, would be in C.W.S.'s best interests and failed to place a heightened burden of proof upon Shields, a nonparent.

¶51 First, the trial court applied a "totality of the circumstances" analysis, which is appropriate when applying the "best interests of the child" analysis in custody disputes between two parents (or nonparents).[9] The trial court weighed the seven factors contained in RCW 26.09.187 for determining the "best interests of the child" by comparing

---

[9] RCW 26.10.100 provides that "[t]he court shall determine custody in accordance with the best interests of the child."

Harwood (the parent) and Shields (the nonparent).[10] The trial court attempted to justify its use of the seven factors by explaining in its memorandum decision that "[i]n spite of the fact that the 'best interests of the child standard' . . . is insufficient to overcome the constitutional right of the parent to rear his or her child, it appears appropriate for the Court to consider and weigh the facts set forth in RCW 26.09.190 in evaluating the totality of the circumstances presented by the case at bar." CP at 246 (citations omitted).

¶52 As part of its memorandum decision, the trial court considered Harwood's employment schedule at the casino (factor 7), C.W.S.'s desire to live with Shields and to have visitation with Harwood (factor 6), C.W.S.'s relationships with his siblings in Washington (factor 5), C.W.S.'s strong relationship with Shields and less strong relationship with Harwood (factor 1), the manner in which Harwood removed C.W.S. from Washington (factor 3), and the limitations placed on C.W.S.'s involvement and contact with his family in Washington while he lived in Oregon (factors 3-5). CP at 234-49.

¶53 Second, and more troubling, instead of appropriately applying the presumption that Harwood, a fit parent, will

---

[10] Under RCW 26.09.187(3)(a), a court must consider the following seven factors, giving the greatest weight to the first factor, when applying the "best interests of the child" standard to determine custody of a child as between two parents:

(i) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;

(ii) The agreements of the parties, provided they were entered into knowingly and voluntarily;

(iii) Each parent's past and potential for future performance of parenting functions;

(iv) The emotional needs and developmental level of the child;

(v) The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;

(vi) The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and

(vii) Each parent's employment schedule, and shall make accommodations consistent with those schedules.

act in the best interests of her child, the trial court applied an opposite presumption against Harwood. The trial court said, "[t]he reasons asserted for separating him [C.W.S.] from his siblings [to live with his mother] do not appear to be compelling in light of the totality of the circumstances." CP at 248. Thus, the trial court required Harwood to provide evidence of "compelling reasons" to gain custody of C.W.S., her son.

¶54 To justify placing the burden on Harwood, the trial court relied on inapplicable case law and cases that have been overruled. For example, the trial court cited both *In re Marriage of Little*, 26 Wn. App. 814, 614 P.2d 242 (1980), *rev'd*, 96 Wn.2d 183, 634 P.2d 498 (1981); and *Smith v. Frates*, 107 Wash. 13, 180 P. 880 (1919), for the proposition that a court can separate siblings in a custody dispute only if it finds "compelling reasons" for doing so. However, both of those cases involved custody disputes between two parents, not a custody proceeding involving a parent and a nonparent. Moreover, neither supports the proposition even in cases involving two parents.

¶55 In *Little*, the Court of Appeals had disapproved of a trial court order that had separated siblings. *Little*, 26 Wn. App. at 817 (explaining that when a mother and father separate, "separation of the children is an added tragedy," and that "[f]or the welfare of the children, they should be allowed to grow up together in one household" (citations omitted)). The Court of Appeals also found that the trial court abused its discretion in granting a temporary custody order while the mother moved and remarried. *Id.* at 819 ("[t]o place the children in a state of limbo and then subsequently separate them to opposite ends of the country is contrary to the legislative mandate of RCW 26.09.260, unsupported by the record, and therefore an abuse of discretion"). On review, this court, though, reversed the Court of Appeals on all grounds, finding that the siblings could be separated if it was in "the best interests" of the children. *Little*, 96 Wn.2d 183.

¶56 Similarly, *Smith* involved a custody dispute between two parents. In awarding custody of the three children to the father under the "best interests of the child" standard, the court explained that in the divorce proceeding, "[t]he serious matter is the welfare of the children, who should be kept together, if possible, and not denied each the others' society." *Smith*, 107 Wash. at 16. This case was later modified by *Frates v. Frates*, 135 Wash. 567, 238 P. 573 (1925) (the court awarded custody of two of the three children to the mother, again under the "best interests of the child" standard).

¶57 The trial court also cited *Webster v. Ryan*, 189 Misc. 2d 86, 729 N.Y.S.2d 315 (2001), for the proposition that C.W.S. has an independent, constitutionally protected right to maintain contact with a parent-like adult against the wishes of his parent. In *Webster*, a New York family court determined that a child has a constitutional right to maintain contact with a foster parent against the wishes of his father. *Id.* at 113. However, the trial court here failed to note that *Webster* was reversed by the New York Supreme Court and was no longer good law at the time of trial. *See Harriet II*, 292 A.D.2d 92. Relying on that overruled case, the trial court placed extraordinary weight on C.W.S.'s preference, concluding that living with Harwood, his mother, was "in effect, against his [C.W.S.'s] will." CP at 248. As a result, Harwood had an even greater burden of proof to meet, contrary to the presumption that should have been accorded to her as a fit parent. The trial court cited no authority for the proposition that, in the context of child custody disputes, a child knows his or her own best interests or a child's preference overcomes the constitutional presumption that a fit parent acts in his or her child's best interests. *Troxel*, 530 U.S. at 69-70.[11]

¶58 Thus, while the trial court claimed to apply the heightened *Allen* standard, the trial court actually applied

---

[11] The trial court placed significant weight on the guardian ad litem's report to support his conclusion that placement with Harwood would result in detriment to C.W.S. As discussed above, however, the guardian ad litem stepped out of his statutory role as independent investigator, giving the trial court his erroneous opinion on the legal standard to be applied. This appears to have misled the court.

the "best interests of the child" standard, allowing a custody award to Shields, a nonparent, based only on a preponderance of the evidence and without the appropriate deference. *Troxel*, 530 U.S. at 66. Instead, under the actual detriment standard set forth in *Allen*, the trial court should have been focusing primarily on the effects on C.W.S.'s long-term growth and development, should he be placed with his mother, and the burden should be squarely placed on Shields. This test is not a balancing of all the aspects of each household and on C.W.S.'s wishes; it is a focused test looking at actual detriment to the child if placed with an otherwise fit parent.

¶59 Thus, we find that the trial court abused its discretion and remand to the trial court to apply the correct legal standard.[12] To avoid moving C.W.S. back and forth unnecessarily between households and disrupting his schooling, C.W.S. should continue to reside with Shields during the proceedings.

CONCLUSION

¶60 We hold that Shields has standing to petition for custody. We also hold that under chapter 26.10 RCW, nonparental actions for child custody, a court may award custody to a nonparent in an action against a parent only if the parent is unfit or if placement with an otherwise fit parent would cause actual detriment to the child's growth and development. The "best interests of the child" standard is not appropriate in these circumstances and the non-parent bears the burden of proof under the heightened standard. Finally, we hold that the trial court abused its discretion by applying the wrong legal standard in deter-

---

[12] Additionally, Harwood claims that the trial court's finding of "actual detriment" was not supported by the evidence. Because we conclude that the trial court applied the wrong legal standard and we remand the case, we do not address this claim.

mining custody of C.W.S., and we remand to the trial court for further proceedings consistent with this opinion.

ALEXANDER, C.J., and C. JOHNSON, SANDERS, BRIDGE, CHAMBERS, OWENS, FAIRHURST, J.M. JOHNSON, JJ., concur.

¶61 BRIDGE, J. (concurring) — I agree with the resolution of this case and with the analysis of the law as set forth in the majority opinion. I concur separately because I want to take this opportunity to acknowledge the often unrepresented third party in any custody dispute, the child. In my mind, decisions about a child's welfare should be premised to a greater degree than our current precedent allows on the concept that a child has a fundamental right to a stable and healthy family life. That right should include independently valued protections of a *child's* relationship with siblings and with adults other than his or her biological parents with whom the child has formed a critical bond. *See, e.g., In re Parentage of L.B.*, 155 Wn.2d 679, 122 P.3d 161 (2005); *In re Celine R.*, 31 Cal. 4th 45, 71 P.3d 787, 1 Cal. Rptr. 3d 432 (2003) (discussing the importance of stable sibling relationships).

¶62 Consideration of rights *the child* holds is of paramount importance because, regardless of the family constellation from which the child comes, in any placement dispute it is *the child* who is the most vulnerable and the most voiceless. Indeed, many practitioners and scholars have long advocated for a more child-centered focus in the resolution of disputes in our family courts. Melinda A. Roberts, *Parent and Child In Conflict: Between Liberty and Responsibility*, 10 NOTRE DAME J.L. ETHICS & PUB. POL'Y 485, 485-505 (1996); Annie G. Steinberg, Barbara Bennett Woodhouse & Alyssa Burrell Cowan, *Child-Centered, Vertically Structured, and Interdisciplinary: An Integrative Approach to Children's Policy, Practice, and Research*, 40 FAM. CT. REV. 116, 121 (2002). This court has recognized as much in the context of paternity disputes. "It would be ironic to find issues of parent-child ties are of constitutional dimen-

sion when the parents' rights are involved but not when the child's are at stake." *State v. Santos*, 104 Wn.2d 142, 143-44, 702 P.2d 1179 (1985). I see no reason why this concern for the constitutional right of the child should be implicated in a paternity proceeding, and not in other proceedings affecting the placement and care of a child.[13]

¶63 *Santos* instructs that, "The importance of familial bonds accords constitutional protection to the parties involved in judicial determinations of the parent-child relationship." 104 Wn.2d at 146. The notion of these "parties" invariably includes the children at issue. *Id.* "Familial bonds" are not just about biology; "biological relationships are not exclusive determination of the existence of a family." *Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 843, 97 S. Ct. 2094, 53 L. Ed. 2d 14 (1977).

> [T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in "promot[ing] a way of life" through the instruction of children as well as from the fact of blood relationship.

*Id.* at 844 (citation omitted); *In re Parentage of L.B.*, 155 Wn.2d 679, 122 P.3d 161 (recognizing de facto parent status for nonbiological parents). Once we recognize that the child's interest in his or her familial bonds is constitutionally protected, *Santos*, 104 Wn.2d at 146, and that familial bonds stem not just from biology, but also from the intimacies of daily association, then it logically follows that a child has a constitutionally protected interest in whatever relationships comprise his or her family unit. It would be prudent, then, for courts and the legislature to begin to acknowledge the harm that may be visited upon a child

---

[13] For example, in keeping with its goals of permanency and stability for the child, California has a statutory scheme that allows courts to take into account familial attachments, such as sibling relationships, when making placement decisions. *See, e.g.*, CAL. WELF. & INST. CODE § 16002 (West 2001); CAL. WELF. & INST. CODE § 366.26 (West Supp. 2006); *In re Celine R.*, 31 Cal. 4th 45; *In re Luke M.*, 107 Cal. App. 4th 1412, 1422-24, 132 Cal. Rptr. 2d 907 (2003). I regret that Washington does not have similar statutory provisions.

when his or her fundamental right to a stable family unit is compromised by the fundamental rights of the biological parent.

¶64  Courts tasked with the difficult duty of resolving the question of a child's welfare may have to reconcile potentially competing interests held by a biological parent and child. But is not, at least in part, a biological parent's right to control the outcome of his or her child's life dependent upon the responsibility he or she has exercised on behalf of that child throughout the child's life, and the interest he or she has taken in the child's rearing?[14] "[T]he mere existence of a biological link does not merit [full] constitutional protection [for a biological parent]." *Lehr v. Robertson*, 463 U.S. 248, 261, 103 S. Ct. 2985, 77 L. Ed. 2d 614 (1983).

> The significance of the biological connection is that it offers the natural [parent] an opportunity that no other . . . possesses to develop a relationship with [the child]. If [the parent] grasps that opportunity and accepts some measure of responsibility for the child's future, he [or she] may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If [the parent] fails to do so, the Federal Constitution will not automatically compel a State to listen to his [or her] opinion of where the child's best interests lie.

*Id.* at 262 (footnote omitted); *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978) (suggesting a stable environment may trump parental rights in certain instances, particularly where the complaining parent has not played a pivotal role in the child's life). Where a biological parent has failed to fulfill his or her responsibili-

---

[14] As long as the burden of showing a truncated parent-child relationship rests with the nonparent, I do not find consideration of the extent to which a biological parent exercises his or her parental duties and obligations to conflict with the ruling in *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). There the Court specifically stated that its decision did not "define . . . the precise scope of the parental due process right in the visitation context." *Id.* at 73. And, obviously, that case concerned a visitation request, one that was challenged by the *custodial* parent. *Id.* at 60-61. Therefore, as the custodial parent, the parent in *Troxel* clearly exercised responsibility and care over her children, which afforded her constitutional rights that may have properly overwhelmed that of her children.

ties to a child, such that the child has formed a stable and healthy family unit outside the boundaries of a blood relationship, it may be that a child's interests and rights are not preserved or respected by placement with that parent.

¶65 I recognize that the present case does not give this court the opportunity to fully flesh out what rights a child may hold in circumstances like those presented here. But I hope that if and when the time comes to define what role the child must play in a decision about his or her life, the contours of that role will be informed by the recognition of some degree of constitutional protection the child holds to stable and healthy family relationships. Moreover, I would hope that in the future our state's courts and our family and child welfare laws move more cohesively toward a recognition of the child's independent rights in questions concerning his or her living arrangement and associations. Such considerations should be manifestly proper in a proceeding where it is ultimately *the child* who has the most at stake. *See Santos*, 104 Wn.2d at 143.