IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Custody of LMS, | ) ) | |
| Minor Child, | ) ) | No. 72938-1-I |
| FAUALUGA and BILLIE SIUFANUA, | ) ) | DIVISION ONE |
| Appellants, | ) ) | |
| v. | ) ) | |
| TONY SAMOA FUGA, | ) ) | UNPUBLISHED OPINION |
| Respondent, | ) ) | FILED: February 8, 2016 |
| and | ) | |
| LISA LYNNETT SIUFANUA, | ) ) | |
| Respondent.† | ) ) | |
| | ) | |

BECKER, J. — Billie and Faualuga Siufanua appeal the trial court's dismissal of their nonparental custody petition for failure to show adequate cause. Their petition and affidavits do not show that the child has special needs that her father cannot meet. The fact that the father remained apart from the child for many years does not, by itself, mean that the father is unfit or unable to meet the child's basic needs. The trial court correctly dismissed the petition.

_____

† Although the case caption designates Lisa Siufanua as respondent, Lisa is not a party to the appeal. However, the case caption will retain Lisa's trial court designation as "respondent."

FACTS

LMS was born in Washington in December 2005 to Tony Fuga, then 20 years old, and Lisa Siufanua, then 18 years old. After her birth, LMS lived in Washington with both of her parents at the home of the Siufanuas, her maternal grandparents. LMS's parents later ended their relationship.

Fuga moved to California when LMS was less than three years old. He has resided there ever since. From the time he moved to California until LMS was eight years old, Fuga saw LMS only once. This visit took place in 2012 or 2013 for one afternoon in California when LMS was vacationing with her mother. Fuga married in 2008. He and his wife now have two sons, approximately five and six years old.

LMS remained in Washington. It is unclear whether LMS ever lived with her mother independently from the Siufanuas. At some point, LMS's mother began to struggle with substance abuse and the Siufanuas took over the care of LMS.

In a parentage action in 2012, the King County Superior Court legally established Fuga as LMS's father, ordered him to pay child support, including back support, and gave custody of LMS to her mother. Fuga did not seek custody of LMS at this time.

On October 3, 2014, Fuga unexpectedly appeared at the Siufanuas' home and discovered that LMS was living there. Fuga claims that this is the first time he learned that LMS was not living with her mother, but instead with the Siufanuas.

On October 8, 2014, just five days after his visit to the Siufanuas' home, Fuga petitioned to modify the 2012 judgment and order establishing parentage to become the custodial parent for LMS. On October 14, 2014, the Siufanuas filed a nonparental custody petition seeking custody of LMS. The two proceedings were consolidated. A superior court commissioner dismissed the Siufanuas' nonparental custody petition for lack of adequate cause. The Siufanuas moved for revision, and the superior court denied their motion. The Siufanuas appeal.

## NONPARENTAL CUSTODY PETITION

The due process clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions regarding the care, custody, and control of their children. Troxel v. Granville, 530 U.S. 57, 66, 120 S. Ct 2054, 147 L. Ed. 29 49 (2000). This protected interest is "perhaps the oldest of the fundamental liberty interests" recognized by the United States Supreme Court. Troxel, 530 U.S. at 65-66 (collecting cases). In deference to this fundamental parental right, a nonparent seeking custody of a child in Washington State must meet a higher burden than the "best interests of the child" standard that governs when the dispute is between parents. In re Marriage of Allen, 28 Wn. App. 637, 649, 626 P.2d 16 (1981).

The nonparent who has filed a custody petition under RCW 26.10 must demonstrate adequate cause for a hearing. This is done by submitting an affidavit alleging facts that, if proved, would establish that (a) placing the child with the parent would result in actual detriment to the child's growth and development or (b) that the parent is unfit. RCW 26.10.032; In re Custody of

3

E.A.T.W., 168 Wn.2d 335, 348, 227 P.3d 1284 (2010) (emphasis added). The court shall deny the petition for nonparental custody unless it finds that adequate cause for hearing on the motion is established by the affidavits. RCW 26.10.032(2).

The Siufanuas contend that the trial court erred in dismissing their nonparental custody petition for lack of adequate cause. Our review is for abuse of discretion. In re Marriage of Maughan, 113 Wn. App. 301, 306, 53 P.3d 535 (2002).

## Actual detriment

Whether placement with a parent will result in actual detriment to a child's growth and development is a highly fact-specific inquiry that must be determined on a case-by-case basis. In re Custody of B.M.H., 179 Wn.2d 224, 236, 315 P.3d 470 (2013). The requisite showing required of the nonparent is substantial, and a nonparent will generally be able to meet this test only in extraordinary circumstances. In re Custody of Shields, 157 Wn.2d 126, 145, 136 P.3d 117 (2006). Actual detriment has been defined as a middle ground, "something greater than the comparative and balancing analyses of the 'best interests of the child' test" but "less than a showing of unfitness." Allen, 28 Wn. App. at 649.

The actual detriment standard can be satisfied where the child has significant special needs that the parents cannot meet. For example, the actual detriment standard was satisfied where the child was deaf and the petitioner stepmother and her three children had learned fluent sign language to communicate with the child and integrate him into their family unit. Allen, 28 Wn.

4

App. at 641. The child's father knew only minimal sign language. Allen, 28 Wn. App. at 641. Additionally, the stepmother had undertaken extraordinary efforts to obtain special training for the deaf child. Allen, 28 Wn. App. at 641. On these facts, the grant of custody to the stepmother was upheld. In another case, this court reversed the trial court and found that the petitioner aunt met her burden to prove actual detriment where the child had been physically and sexually abused and needed extensive therapy and stability at a level that the parents had not been able to provide. In re Custody of Stell, 56 Wn. App. 356, 783 P.2d 615 (1989).

In contrast, the Washington State Supreme Court recently reversed a finding of actual detriment where the child had no special needs. B.M.H., 179 Wn.2d at 224. In B.M.H., the stepfather alleged detriment to the child on the basis that the mother was moving with the child 50 miles away and that she would interfere with his relationship with the child. B.M.H., 179 Wn.2d at 237. It was not alleged that B.M.H. had any special needs. Our Supreme Court distinguished the case of B.M.H. from Allen and Stell on the basis that in each of those cases, the child had significant special needs that would not be met if the child were in the custody of the parent. B.M.H., 179 Wn.2d at 239. The court reasoned that continuity of psychological relationships and family units was particularly important where a child has special needs. B.M.H., 179 Wn.2d at 239. Absent such extraordinary circumstances, the court held that the custody petition should be dismissed because the stepfather had not met his burden to show actual detriment to the child. B.M.H., 179 Wn.2d at 239.

This case is analogous to B.M.H. There is no allegation that LMS has a special need. Nor is there evidence in the record that Fuga is currently unable to meet LMS's needs. To the contrary, unrebutted written declarations from both Fuga and his wife establish that they are currently parenting two young sons successfully.

The Siufanuas allege that they have acted as LMS's parents "for all of her life" and that she would suffer actual detriment if she were ripped away from "the only home she has ever known and the only family she has ever known." They allege that Fuga is a "stranger" to LMS because "he has lived in another state for the better part of a decade with only minimal contact with the child." But moving a child away from a nonparent to whom the child is bonded is not, by itself, actual detriment. Our Supreme Court rejected that argument in B.M.H.

The Siufanuas lean heavily on the fact that Fuga was almost entirely absent from his daughter's life for many years while the Siufanuas were raising her. But even such a long absence does not establish actual detriment as the cases have illuminated the meaning of that term. Fuga's fundamental right to custody of his daughter is protected by the Fourteenth Amendment despite his long absence from her life. Weighed against the fundamental protected right of the biological parent, even the fact that the Siufanuas have been raising LMS for most of her remembered life is not enough to prove that placing LMS with Fuga will be an actual detriment to her further growth and development.

The Siufanuas analogize to Stell, 56 Wn. App. 356, arguing that we should look to whether the nonparent has become a "psychological parent." In Stell,

uncontroverted expert testimony indicated that the child's aunt had become his psychological parent. Stell, 56 Wn. App. at 359. There is no comparable evidence in this case. To the contrary, the superior court commissioner found that LMS "has a relationship with the father and thinks of the father as her father." The Siufanuas do not dispute that LMS knows Fuga is her father and recognizes him as such. Their allegation that LMS refers to them as "'mom and dad'" does not establish that they have become LMS's psychological parents as that term is used in Stell.

The Siufanuas also analogize to In re Interest of Mahaney, 146 Wn.2d 878, 51 P.3d 776 (2002), arguing that we can take into account the continuing detrimental effects of a parent's past unfitness. In Mahaney, the children lived with their grandmother for approximately a decade after their parents essentially abandoned them. Mahaney, 146 Wn.2d at 884. The mother's petition to have the children returned to her was denied. Mahaney, 146 Wn.2d at 884-85. However, the children in Mahaney had special needs in the form of severe mental and behavioral illnesses. Mahaney, 146 Wn.2d at 885. These children's special needs were causally connected to their parents' past behavior, including domestic violence, substance abuse, and allegations of sexual abuse at the hands of their mother and her family. Mahaney, 146 Wn.2d at 884, 894-95. The problems caused by the parents' abuse and neglect of the children were documented by expert witnesses. Mahaney, 146 Wn.2d at 885, 892. The Siufanuas do not offer factual support for the argument that Fuga's absence caused similar damage to LMS. They merely allege that "there is no doubt that

7

she has suffered and will suffer from his absence in her life, and that is not something that is simply undone by his return." The conclusory nature of the analogy to Mahaney makes it unpersuasive.

The Siufanuas also allege actual detriment to LMS based on the fact that Fuga has a history of domestic violence. The record contains evidence of one domestic violence charge filed against Fuga. He was charged with assaulting LMS's mother in April 2005, when she was pregnant with LMS. Fuga completed court-ordered domestic violence treatment, and the charge was dismissed. Domestic violence is never to be condoned, but the weight to be given to this incident is limited because it happened over a decade ago and we have no evidence that Fuga has any other criminal history.

We conclude that the trial court did not abuse its discretion in finding that placing LMS with her father would not result in actual detriment to her growth or development.

### Unfitness

A parent is unfit if he cannot meet the child's basic needs. B.M.H., 179 Wn.2d at 236. The Washington State Supreme Court has looked to Washington's dependency statutes and statutes relating to child abuse and neglect for guidance in determining whether a parent is unfit. See, e.g., B.M.H., 179 Wn.2d at 236 (citing RCW 26.44); Shields, 157 Wn.2d at n.6 (citing chapter 13.34 RCW and chapter 26.44 RCW). In this case, where the only alleged ground of parental unfitness is the parent's absence from the child's life for many years, the analogous ground of dependency is abandonment. Abandonment is

8

defined as "when the child's parent, guardian, or other custodian has expressed, either by statement or conduct, an intent to forego, for an extended period, parental rights or responsibilities despite an ability to exercise such rights and responsibilities." RCW 13.34.030(1).

The Siufanuas contend that Fuga's absence during most of LMS's life is abandonment. The Siufanuas allege that LMS was living with them at their home the entire time, so Fuga should have known where to find her. They argue that "the most critical element of a fit parent . . . is that that parent is *there* for the child. Without even seeing the child or participating in the child's life, a parent is not even performing that most basic function that has to comprise the core of fit parenting."

Fuga responds that he was out of contact with LMS because he believed that the child was living with her mother, who cut off contact by repeatedly changing her phone number and moving residences without informing him. Fuga says that he did not find out that LMS was living with the Siufanuas until he showed up at their home in October 2014 to ask them where she was. Fuga does not persuasively explain why he did not take this step earlier. At the same time, the Siufanuas do not claim that they ever tried to let Fuga know that they had taken over the care of LMS. On this record, it is fair to say that LMS's mother, and perhaps the Siufanuas as well, played a part in Fuga's failure to maintain a close relationship with his daughter.

Fuga probably could have done more to find LMS and renew his relationship with her. Still, even if his conduct has some of the hallmarks of

abandonment, the important question is whether his past absence has rendered him currently unable to meet LMS's basic needs. On that question, the unrebutted evidence shows him to be able and willing. We conclude that the trial court did not abuse its discretion in finding that Fuga is not unfit to parent his daughter.

## GUARDIAN AD LITEM

At the adequate cause hearing, the Siufanuas requested the appointment of a guardian ad litem to represent LMS's interests. The commissioner denied the request for a guardian ad litem, stating that it was probably not necessary and would be very expensive. Instead, the commissioner ordered a home visit as a means to assure that Fuga's home is appropriate for LMS. At the revision hearing, the Siufanuas renewed their request for a guardian ad litem. The court denied it. On appeal, the Siufanuas contend that a guardian ad litem should have been appointed.

A court may appoint a guardian ad litem to represent the interests of a minor or dependent child "when the court believes the appointment of a guardian ad litem is necessary to protect the best interests of the child." RCW 26.12.175. Under this statute, a court may appoint a guardian ad litem in contested custody proceedings. RCW 26.10.130. A trial court should appoint a guardian ad litem or an attorney for a child if it would assist the court in determining the custody issue. Stell, 56 Wn. App. at 370-71. In Stell, the trial court refused to consider repeated and unanimous expert opinions. This court reversed and ordered that a guardian ad litem be appointed on remand. Stell, 56 Wn. App. at 370-71.

The decision to appoint a guardian ad litem is discretionary. See RCW 26.12.175; RCW 26.10.130 (court *may* appoint a guardian ad litem). A trial court abuses its discretion if its decision is not based on tenable grounds or tenable reasons. Eagle Point Condo. Owners Ass'n v. Coy, 102 Wn. App. 697, 701, 9 P.3d 898 (2000). Here, the court had a tenable basis for refusing to appoint a guardian ad litem. An adequate cause determination is based on the parties' affidavits, and the affidavits did not show adequate cause for an evidentiary hearing. In contrast to Stell, there was no custody trial in this case, nor did the trial court refuse to consider evidence. We find no abuse of discretion.

Both parties request attorney fees under RCW 26.10.080, which provides that upon any appeal, "the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorney's fees in addition to statutory costs." We must balance the needs of the party requesting fees against the other party's ability to pay. See, e.g., B.M.H., 179 Wn.2d at 244. Balancing the parties' respective needs and ability to pay, we decline to award attorney fees.

Affirmed.

Becker, J.

WE CONCUR:

Trickey, J

Spearman