FILED
COURT OF APPEALS
DIVISION II

2014 JUN 10 PM 12: 23

STATE OF WASHINGTON

BY
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re Dependency of<br><br>J.A.,<br><br>A minor. | No. 45134-4-II<br><br>UNPUBLISHED OPINION |

HUNT, P.J. — We granted JA's[1] petition for review of the juvenile court's denial of his motion to appoint counsel at public expense under RCW 13.34.100(6) to represent him in his dependency proceedings. JA argues that the juvenile court abused its discretion in finding that his request did not meet the *Mathews*[2] factors because (1) he had a significant private interest at stake; (2) the juvenile court failed to consider the benefit of additional safeguards for JA, namely his own counsel to advocate for him; and (3) the government's interest in protecting him outweighed the cost of counsel. JA also argues that the State's failure to require appointment of counsel for all children in dependency proceedings violates the due process clauses of the U.S. Constitution[3] and the Washington Constitution[4] and that the Washington Constitution provides greater due process rights to dependent children than its federal counterpart.

In light of the new evidence JA presented, we hold that the juvenile court misapplied the *Mathews* factors when it denied his motion for reconsideration. Therefore, we reverse the

---

[1] To provide some confidentiality, we use the juvenile's and his family's initials in the case caption and in the body of the opinion.

[2] *Mathews v. Eldridge,* 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

[3] U.S. CONST. amend. XIV.

[4] WASH. CONST. art. I, § 3.

juvenile court's denial of JA's motion for reconsideration and remand with instructions to appoint counsel for JA for his dependency proceeding. Accordingly, we neither address whether the juvenile court erred in denying JA's initial request for appointment of counsel nor reach the issue of whether due process requires appointment of counsel for all juveniles involved in dependency proceedings.

## FACTS

### I. DEPENDENCY BACKGROUND

JA is a developmentally delayed 15-year-old boy[5] who functions at a 7-year-old level. In school, he has been in a self-contained classroom with an individual education plan for special education and behaviors. JA's mother, MB, has been involved in at least eight previous Department of Social and Health Services (DSHS) referrals involving JA. DSHS had concerns about MB's physical abuse and neglect of JA and concerns about MB's mental health based on past referrals for her own developmental delay, learning disabilities, and diagnoses of bi-polar, depression, and anxiety.

As a result of MB's neglecting JA, his father, CA,[6] obtained custody of JA in 2009. CA has a criminal history, including multiple failures to register as a sex offender, obstructing, intent to manufacture methamphetamine, refusal to give information, and burglary.

On February 2, 2010, JA's school staff filed a referral with DSHS alleging concerns about physical abuse by CA: JA had bruising along his left collarbone up through his left

---

[5] JA was born in March 1999.

[6] CA is not a party to this appeal; we address CA only to the extent that his involvement affects JA's right to appointment of counsel on appeal.

shoulder area, and JA had reported that his father was "mad and 'hurt [him].'" Clerk's Papers (CP) at 3. Following up on JA's report, a social worker spoke with JA at school and observed red marks on JA's left collarbone; JA reported the marks were from his father. The social worker then spoke with CA, who (1) said that JA's bruises were from a fight at school, (2) denied using physical force to discipline JA, and (3) disclosed he had past methamphetamine charges for which he had served two years in prison but he had been clean since then.

In May 2010, the social worker received another referral about JA's family. She went to JA's home and spoke to the landlord, who reported that he had evicted JA's family and that he had seen CA's girlfriend pull a knife on CA and push JA to the ground. The social worker later spoke with CA, who denied drug use, admitted numerous domestic violence incidents with his girlfriend, and admitted bringing JA back to his girlfriend's residence after she had pulled a knife on him and JA.

## II. PROCEDURE

### A. Dependency Hearings

On June 3, 2010, Children's Protective Services (CPS) filed a dependency petition under RCW 13.34.030(6)(b) and (c)[7], alleging that JA had been abused by his father and had no parent, guardian, or custodian capable of adequately caring for him such that he was in circumstances constituting a danger of substantial damage to his psychological or physical development. The juvenile court appointed JA a guardian ad litem (GAL), who was later replaced by a different

---

[7] The legislature amended RCW 13.34.030 in 2010, 2011 and 2013. The amendments did not alter the statute in any way relevant to this case; accordingly, we cite the current version of the statute.

GAL. On June 4, DSHS placed JA into foster care at a Behavioral Rehabilitation Service (BRS) foster home. He was found dependent in August. Both MB and CA were authorized weekly two-hour supervised visits with JA. In September 2010, the juvenile court ordered psychotropic medication treatment for JA's Attention Deficit Hyperactivity Disorder (ADHD), night-time impulsivity, and hyperactivity.

On September 27, the juvenile court held JA's first dependency review; neither MB nor CA appeared. The juvenile court recommended returning JA to his mother and father as JA's permanency plan. The juvenile court (1) found that MB was not compliant with the court's initial order and that neither parent had visited JA; (2) determined that DSHS should continue placing JA in foster care; and (3) ordered MB to provide documents to the social worker and to the GAL, to undergo urinalysis testing, and to provide DSHS with relevant progress reports. On September 30, DSHS appointed a third new GAL for JA.

In March 2011, the juvenile court held a permanency planning hearing. It found that MB was still not compliant with the court's order and had made no progress correcting the parenting deficiencies that had necessitated JA's placement in foster care. At another review hearing on September 13, the juvenile court found that MB was not in compliance with her responsibilities under the court's dispositional plan.[8] DSHS recommended adoption as JA's permanent plan,

---

[8] The dispositional plan required MB to cooperate with DSHS by (1) providing information to establish JA's eligibility for medical care, (2) providing written documents to the social worker and the GAL, (3) participating in three random urinalysis tests and psychological evaluations, (4) keeping the social worker informed of her (MB's) contact information, (5) contacting the social worker about her progress reports, (6) updating releases of information for "past and present records," and (7) demonstrating an ability to maintain a safe, stable, and protective home for raising a child. CP at 187.

with returning JA to his family as an alternate permanent plan.[9] The juvenile court determined that JA should remain in foster care pending a permanent plan. Given both parents' lack of compliance and lack of progress with DSHS's recommendations, DSHS stated it would file a termination petition.

In January 2012, the GAL reported that JA continued residing in the BRS foster home, still struggling with using foul language, threatening people, hoarding food, and running away from case aides; nevertheless, he appeared to be happy in this foster home placement. The GAL further reported that JA's foster parent, Marilyn Mora, was willing to keep JA as long as he remained in the BRS program. The GAL recommended (1) finding both MB and CA not in compliance and not making progress; and (2) adoption as JA's new permanent plan, because he deserved permanence and stability in his life.

In February, the juvenile court held another permanency planning hearing; again, MB was not present. The juvenile court recommended adoption as a primary permanency plan for JA, with foster care as an alternative permanency plan. CA had been recently incarcerated to serve a 43-month sentence.

Thus, in June, JA continued his placement with foster parent Mora and received services in the BRS Program. JA's latest social worker (his third since the original referral) noted that JA (1) had recently graduated from elementary school to middle school; (2) had been placed into a

---

[9] The juvenile court did not consider returning JA to his family home as the primary permanent plan because neither parent had participated in services or demonstrated an ability to make life changes to enable effective parenting or to provide a safe stable home free of drug use, domestic violence, and criminal activity.

youth inpatient unit because of his mental instability; (3) had suffered a "meltdown"[10]—refusing to get ready for school, pounding on windows, and breaking a baseboard heater in his inpatient home, which resulted in his being taken into juvenile detention; and (4) had made statements about wanting to "get" his foster mother in jail. CP at 301. Since the last review hearing, however, MB had told DSHS that she lacked mental capacity and was not a resource for her son.

JA's latest GAL reported that JA had visits with his mother, which went well, and wanted to go home with his family. Nevertheless, the GAL recommended adoption as JA's primary permanent plan because his parents showed no interest in being a placement resource for him. In July, the juvenile court held a dependency review and, in considering the aforementioned reports, recommended adoption as a permanent plan, with the alternative of returning JA home to MB.

On December 13, the juvenile court held another dependency review. Mora reported that (1) after visits with his mother, JA was emotional and expressed wanting to "go home"; (2) JA had begun urinating and defecating in his room in Mora's presence; and (3) she wanted to be considered as a permanent placement resource for him. CP at 342. The GAL also reported that JA continued to express wanting to go home to his family, that he continued visiting his mother and sister weekly, and that according to JA his visits with his mother and sister went well. At this point, the GAL recommended that the juvenile court adopt a "Title 13 Guardianship"[11] as JA's permanent plan rather than terminating MB's or CA's parental rights. CP at 343. The juvenile court again found MB not compliant with the court's order and that MB had made no progress toward correcting the problems that had necessitated JA's foster care placement. The

---

[10] CP at 300.

[11] Title 13 RCW.

juvenile court ordered dependency guardianship as JA's primary permanency plan and adoption as the alternative permanency plan.

### B. JA's RCW 13.34.100 Motion for Appointment of Counsel at Public Expense

Three months later, on March 1, 2013, JA filed a motion for appointment of counsel at public expense under RCW 13.34.100. The University of Washington's Children and Youth Advocacy Clinic (Clinic) entered a notice of limited appearance as counsel for JA to move for appointment of counsel. JA's GAL (1) objected to appointment of counsel for JA on grounds that JA was well served by having a GAL; (2) expressed concerns about who had provided the Clinic with JA's information and was surprised to learn that someone had signed a release of JA's school records to the Clinic; (3) mentioned that no one had notified him about JA's wanting an attorney; (4) stated he did not support reunification because throughout the dependency action, JA's parents had been noncompliant and had not made progress to correct their parental deficiencies; and (5) noted that MB was unable to care for JA given her history of physical abuse, neglect, and mental health "concerns." CP at 444.

On March 14, the juvenile court held a hearing to consider JA's motion. Appearing were JA's GAL; his social worker; an attorney on DSHS's behalf; an attorney on MB's behalf; and a Clinic Rule 9 legal intern[12] on JA's behalf, accompanied by a supervising attorney. JA, however, was not present. Concerned about JA's absence, the juvenile court rescheduled the hearing so JA could be present. A week later, on March 21, JA appeared in person and through

---

[12] APR 9 grants a limited license to law students, law clerks, and recent law school graduates to practice law under the supervision of a lawyer who has at least three years of legal experience.

the Clinic's Rule 9 legal intern and supervising attorney. MB appeared also with her attorney.

The juvenile court asked to speak to JA.

The juvenile court asked JA why he was in court, and JA responded, "Because me and— we were—I want an attorney." Verbatim Report of Proceedings (VRP) (Mar. 21, 2013) at 7.

The court asked JA additional questions about his request for an attorney:

> THE COURT: Okay. What does an attorney do?
> [JA:] Talks to the judge.
> THE COURT: Okay. So, what would—if you had an attorney, what would the attorney tell me?
> [JA:] Like, I want to go home to my mom.
> THE COURT: Okay. Is there anything else?
> [JA:] No.
> THE COURT: Just that you want to go home with your mom?
> [JA:] Yeah.
> THE COURT: Okay. So, you just told me that's what you want.
> [JA:] Yeah.
> THE COURT: So, why do you need an attorney to tell me that?
> [JA:] Because I want an attorney.
> THE COURT: Okay. So, what difference does that make? If you tell me that's what you want, why would you need an attorney to tell me that?
> [JA:] Because I want one.
> THE COURT: Because you want one?
> [JA:] Yeah, and attorneys are cool.

VRP (Mar. 21, 2013) at 7-8.

> After the hearing, the juvenile court entered the following relevant findings of fact,
>
> 10. Throughout these [dependency] proceedings, the mother has not been compliant and she has not made progress. At one point, it was ordered that a petition for termination be filed. Meanwhile, there have been people looking out for the child's best interests.
>
> 11. At the March 21, 2013 hearing, the court requested to hear directly from [JA]. At that hearing, [JA] was able to speak with the court directly. [JA] stated that he wanted an attorney. [JA] indicated that he understood what was going on but could not articulate what an attorney could do, other than that an attorney 'talks to

the judge' as well as to [JA], and could tell the court that [JA] 'want[s] to go home to [his] mom.' [JA] stated that it would be 'cool' to have an attorney.

. . .

13. At the March 21, 2013 hearing, [JA] clearly expressed in court that he wants to return home to be with his mother. The GAL and the social worker have informed the court of this in the past. [JA] showed he is perfectly capable of talking to the court directly about his wish to return home. [JA] said 'My mom's not even doing the classes.'

14. The court understands that [JA] would like to go home with his mother but she is not capable of caring for him now. This does not mean that she will never be able to care for him.

15. [JA] also informed the court directly that he likes where he is currently living [his foster home] and he feels safe there.

CP at 574-75.

The juvenile court also rendered the following pertinent conclusions of law:

3. The private interest at stake in this case is the interest that the child has in achieving permanency. . . . Guardianship is in the child's best interest. The court acknowledges that the child's stated interest is in reunification, but the court finds that alternative is not available at this time and that given he is in a safe placement at this time with a caregiver who is willing to serve as his guardian, *his private interests are not that great.*

4. *There are cases where counsel may be necessary, such as*
    (a) *where a child has viable alternatives and there's a difference of opinion between the child and the GAL or social worker,*
    . . . .
    (c) Other special circumstances where an attorney should be appointed for limited purposes.

5. The fact that guardianship is the permanent plan makes the privacy interest less compelling and impacts the analysis regarding appointment of counsel for [JA].

6. The risk of error in this case is low given that the court's team of social workers is committed and the court has had lots of experience with the team. In

9

addition, there are several lawyers already on the case. Finally, *the GAL's role is to tell the court, at every hearing, what the child's wishes are.*

7. The countervailing government interest in this case is that there are limited resources for attorneys for children in this country. Given the private interests at stake and the risk of error in this case, those limited financial resources should not be spent in this case.

CP at 575-76 (emphasis added) (some alterations in original). The juvenile court denied JA's request for appointment of an attorney.

### C. Motion for Reconsideration

Two weeks later, on April 2, Mora sent the juvenile court a letter stating her belief that JA belonged with his mother, MB, and that

> [f]or the last two months [JA]'s mother has taken the trouble to keep in touch with her son by telephone on a daily basis, makes sure she is aware of his needs and desires, has never relinquished her rights as his guardian, and in all ways behaves like a concerned and engaged parent. During this time, [JA]'s attitude and school grades have greatly improved.

CP at 555. Mora further explained that (1) she did not wish to assume guardianship for JA because she believed JA's relationship with his mother dictated that he "be with her," and (2) she (JA's foster mother) had never considered adopting JA. CP at 555.

On May 20, JA's Clinic Rule 9 intern filed a CR 59(a) motion for reconsideration of the juvenile court's May 9 order denying JA appointment of legal counsel because there was newly discovered material evidence: (1) JA's foster mother's letter, sent after the March 21 hearing, stating that she did not wish to assume guardianship of JA and that she believed JA and his mother should be reunified; and (2) JA's newfound awareness, after the March 21 hearing, that his father would soon be released from prison and wanted to be a part of JA's life.

10

In support of his motion for reconsideration, JA declared that (1) he still wanted a lawyer, (2) he did not want to see his father because his father was not "safe for [JA] at all,"[13] (3) he (JA) wanted a lawyer to tell the judge that his father should not get to see him or talk to him, (4) he (JA) wanted to be with his mother because it helped him feel better and she "is safe,"[14] (5) he wanted a lawyer to help him see his mother as much as he could and to help him "someday live with [his] mom,"[15] and (6) he wanted a lawyer to help him explain why he wanted to stay with his foster mother until he had a chance to stay with his mother, MB.

On May 9, the juvenile court held a permanency planning hearing at which DSHS recommended that JA remain in non-parental custody, that JA's primary permanency plan be a guardianship with an alternative of non-parental custody, and that the court not terminate parental rights given JA's desire to maintain familial ties. MB's attorney noted that MB had visited CPS on five occasions for psychological evaluation, urinalysis, and parenting classes.

JA's GAL expressed concerns about (1) JA's March 22 three-day juvenile hall detention after he had a "meltdown,"[16] which the GAL believed was "uncalled for"[17] because JA was not a criminal and the detention "terrified"[18] JA; (2) JA's verbal abusiveness to Mora, who had called

---

[13] CP at 556.

[14] CP at 556.

[15] CP at 556.

[16] VRP (May 9, 2013) at 25.

[17] VRP (May 9, 2013) at 25.

[18] VRP (May 9, 2013) at 26.

law enforcement because "she did not get the support from . . . BRS" "that's supposed to have services around this home to assist with [JA's] behavior"; and (3) the unavailability of JA's BRS foster home. VRP (May 9, 2013) at 25. The GAL also expressed frustration because "they're not providing" him with information he requested about JA and JA's detention incident report and because DSHS and Catholic Community Services (CCS) had failed to return his (GAL) call about the issue. VRP (May 9, 2013) at 27.

When the juvenile court asked for further information about the detention, CCS said it did not have such information but could obtain it for the court. The juvenile court noted they were "having a lot of miscommunication"[19]; "this is really not working"[20]; the court was not getting all the information it had requested from CPS; and the court hoped to get "a little better responsiveness" in obtaining information such as JA's file review, visitation notes, and mental health notes. VRP (May 9, 2013) at 30. JA told the juvenile court that (1) he wanted a new social worker because his latest social worker "was talking about [JA's] mom," VRP (May 9, 2013) at 35; and (2) in response to the court's question, he had gone to detention between the first motion hearing and the current hearing.

The juvenile court ruled that (1) JA's foster mother's letter was newly discovered material evidence not previously available to JA through reasonable diligence at the time of the original hearing on JA's motion to appoint counsel; (2) JA's father's possible release from prison and desire to reconnect with JA was also material evidence not previously available to JA through reasonable diligence at the time of the original hearing; (3) these two pieces of new

---

[19] VRP (May 9, 2013) at 31.

[20] VRP (May 9, 2013) at 31.

material evidence required a re-weighing of the *Mathews* factors in considering JA's motion for appointment of counsel at public expense; (4) the new evidence did not change the weight given to JA's private interests, given JA's consistent previous statements that he wanted to return to his mother; (5) the countervailing government interest continued to be that there are limited resources for attorneys for children in Pierce County; and (6) after reconsidering the new evidence and re-weighing the *Mathews* factors, the compelling nature of JA's private interest and the risk of error remained unchanged. Consequently, the juvenile court denied JA's motion for reconsideration.

### D. Appeal

JA sought discretionary review of the juvenile court's May 9, 2013 order denying his motion for appointment of counsel at public expense and the June 17, 2013 order denying JA's motion for reconsideration. A commissioner granted JA's petition under RAP 2.3(b)(2), which provides for discretionary review when "[t]he superior court has committed probable error and the decision of the superior court substantially alters the status quo or substantially limits the freedom of a party to act[.]" RAP 2.3(b)(2). Our commissioner granted discretionary review of (1) all three *Mathews* factors and the facts available to the juvenile court when it decided both the original and reconsideration orders denying appointment of counsel; and (2) the state

constitutional issue.[21] And because this case involves a dependent child, our commissioner accelerated review.

## ANALYSIS

JA first contends that the juvenile court abused its discretion in twice denying his request for appointment of counsel at his dependency proceeding. JA argues that the juvenile court erred in applying the *Mathews* factors because it (1) undervalued his private interest, based on its conclusion that guardianship was no longer an option for him; (2) understated the risk of error and value of additional or substitute safeguards for him; and (3) focused too heavily on the public cost of appointment of counsel. We assume, without deciding, that the juvenile court did not abuse its discretion in denying JA's original request for appointment of counsel.

But we hold that the juvenile court abused its discretion in denying JA's motion for reconsideration because the new evidence JA presented (1) significantly altered the weighing of the *Mathews* factors, especially the first two—JA's private interest and the risk of error, which factors the juvenile court misapplied; and (2) caused these two factors to outweigh the third factor—the State's interest in any resultant fiscal and administrative burdens—such that JA was entitled to counsel under RCW 13.34.100(6)(f).

At the outset, we note that the issue before us—a child's right to appointed counsel in a dependency proceeding—is one of first impression, expressly left open by our Washington

---

[21] Six amicus curiae briefs were filed in support of JA's appeal, focusing primarily on the federal due process issue, by (1) the American Civil Liberties Union of Washington, the Mockingbird Society, and Legal Counsel for Youth and Children; (2) Disability Rights Washington; (3) the Washington Defender Association and King County Department of Public Defense; (4) the Washington State Psychological Association; (5) the Juvenile Law Center, et. al.; and (6) the Foster Parents Association of Washington State.

Supreme Court when it considered the right to appointment of counsel for a child in a parental termination proceeding two years ago:

> We hold the due process right of children who are subjects of dependency or termination proceedings to counsel is not universal. The constitutional protections, RCW 13.34.100(6), and our court rules give trial judges the discretion to decide whether to appoint counsel to children who are subjects of dependency or termination proceedings.[FN13]
>
> FN13. We recognize that this is an appeal of a termination order. *Nothing in this opinion should be read to foreclose argument that a different analysis would be appropriate during the dependency stages.*

*In re Dependency of M.S.R.*, 174 Wn.2d 1, 22 n.13, 271 P.3d 234 (2012) (emphasis added).

We note, however, that "[i]f it is not necessary to reach a constitutional question, it is well established policy that we should decline to do so."[22] *State v. Speaks*, 119 Wn.2d 204, 207, 829 P.2d 1096 (1992). Thus, we decline to address JA's and amici's constitutional claims because we can resolve this case by determining a non-constitutional question, namely, whether the juvenile court abused its discretion in denying JA's motion for reconsideration of the court's earlier denial of his request for appointed counsel under RCW 13.34.100(6), to which we apply the *Mathews* factors.

---

[22] *See also* JA's appellate counsel's oral argument agreement that we need not address the constitutional due process argument for right to counsel if we hold that the juvenile court abused its discretion in failing to appoint counsel for JA under the statute. And although DSHS argued that we should uphold the constitutionality of RCW 13.34.100(6), JA does not challenge the constitutionality of this statute.

## I. RCW 13.34.100(6)

RCW 13.34.100(6)[23] provides, in pertinent part:

> (a) Pursuant to this subsection, the department or supervising agency and the child's guardian ad litem shall each notify a child of his or her right to request counsel and shall ask the child whether he or she wishes to have counsel. The department or supervising agency and the child's guardian ad litem shall notify the child and make this inquiry immediately after:
>
> . . .
>
> (ii) Assignment of a case involving a child age twelve or older[.]
>
> . . .
>
> (d) The department or supervising agency shall note in the child's individual service and safety plan, and the guardian ad litem shall note in his or her report to the court, that the child was notified of the right to request counsel and *indicate the child's position regarding appointment of counsel.*
>
> (e) At the first regularly scheduled hearing after:
>
> . . .
>
> (ii) The date that a dependency petition is filed pursuant to this chapter on a child age twelve or older;
>
> . . .
>
> the court shall inquire whether the child has received notice of his or her right to request legal counsel from the department or supervising agency and the child's guardian ad litem. The court shall make an additional inquiry at the first regularly scheduled hearing after the child's fifteenth birthday. . . .
>
> (f) *If the child requests legal counsel and is age twelve or older,* . . . . the court *may* appoint an attorney to represent the child's position.

(Emphasis added).

Under this statute, our legislature has vested the juvenile court with discretion to appoint counsel for a child over the age of 12 in a dependency petition.[24] The legislature does not,

---

[23] Although not pertinent to our decision here, we note that effective July 1, 2014, the legislature has amended this statute to expand a child's right to counsel in dependency and termination cases. H.B. REP. on Engrossed Second Substitute S.B. 6126, at 4-5, 63rd Leg., Reg. Sess. (Wash. 2014).

16

however, set forth specific factors for the juvenile court to apply in exercising its discretion; nor does the legislature note a source of funds to cover the cost of appointing counsel under this statute.

Nevertheless, the following legislative note accompanying its creating the child's potential right to counsel in dependency and parental termination proceedings states:

(1) The legislature recognizes that inconsistent practices in and among counties in Washington have resulted in few children being notified of their right to request legal counsel in their dependency and termination proceedings under RCW 13.34.100.

(2) The legislature recognizes that when children are provided attorneys in their dependency and termination proceedings, it is imperative to provide them with well-trained advocates so that their legal rights around health, safety, and well-being are protected. *Attorneys, who have different skills and obligations than guardians ad litem and court-appointed special advocates, especially in forming a confidential and privileged relationship with a child,* should be trained in meaningful and effective child advocacy, the child welfare system and services available to a child client, child and adolescent brain development, child and adolescent mental health, and the distinct legal rights of dependent youth, among other things. *Well-trained attorneys can provide legal counsel to a child on issues such as placement options, visitation rights, educational rights, access to services while in care and services available to a child upon aging out of care. Well-trained attorneys for a child can:*

(a) *Ensure the child's voice is considered in judicial proceedings;*

(b) *Engage the child in his or her legal proceedings;*

(c) *Explain to the child his or her legal rights;*

(d) *Assist the child, through the attorney's counseling role, to consider the consequences of different decisions;* and

(e) *Encourage accountability, when appropriate, among the different systems that provide services to children.*

---

[24] Interestingly, the legislature requires the court to make annual inquiries about the child's desire for appointed counsel, especially after the age of 15. RCW 13.34.100(6)(e).

LAWS OF 2010, ch. 180 § 1 (legislative findings accompanying amendment to RCW 13.34.100) (emphasis added).

## II. STANDARD OF REVIEW

Under RCW 13.34.100, a court's decision to appoint counsel for children in dependency proceedings is discretionary, and we review such a decision for abuse of discretion. *In re Welfare of J.H.*, 75 Wn. App. 887, 894, 880 P.2d 1030 (1994), *review denied*, 126 Wn.2d 1024 (1995) ("Orders in dependency cases are reviewed for abuse of discretion."). A superior court abuses its discretion if it exercises discretion without tenable grounds or reasons. *State ex. rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). Although RCW 13.34.100 does not specify criteria for determining whether to appoint counsel, our Supreme Court recently held that the decision to appoint counsel for a child in a termination of parental rights or a dependency proceeding should be examined on a case-by-case basis. *M.S.R.*, 174 Wn.2d at 22. We evaluate termination counsel requests using the factors set forth in *Mathews*. *M.S.R*, 174 Wn. 2d at 22 (citing *Mathews*).[25]

The *M.S.R.* court, however, later amended its opinion and expressly refrained from ruling that *Mathews* applied to a juvenile's dependency counsel request:

---

[25] Our Supreme Court further held that appointment of counsel for a child in a parental termination proceeding is mandatory if, after balancing the *Mathews* factors, the statute and due process so require. *M.S.R*, 174 Wn. 2d at 21-22. As we have previously noted, in the instant dependency context, we resolve the case based on the statute and the *Mathews* factors alone, without undertaking a constitutional due process analysis about whether appointment of counsel here was mandatory as in *M.S.R.*.

> We recognize that this is an appeal of a termination order. Nothing in this opinion should be read to foreclose argument that a different analysis would be appropriate during the depende[n]cy stages.

*M.S.R.*, 174 Wn.2d at 22 n.13.

JA's case involves a dependency. Nevertheless, the juvenile court here cited *M.S.R.* and applied the *Mathews* factors in determining whether to appoint counsel for JA. And the parties here do not argue that we should apply a different analysis in the dependency context. Therefore, we also apply the *Mathews* factors to the unique facts of this case to determine whether the juvenile court abused its discretion in denying JA's motion to reconsider his request for appointment of counsel under RCW 13.34.100(6).

### III. *MATHEWS* FACTORS

In deciding whether to appoint counsel, *Mathews* requires weighing three factors: (1) the private interest at stake; (2) the risk of erroneous deprivation by the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *M.S.R.*, 174 Wn.2d at 14 (quoting *Lassiter v. Dep't of Soc. Serv.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981) (citing *Mathews*, 424 U.S. at 335)). We address each factor in turn, keeping in mind our Supreme Court's instructions to consider the relevant circumstances on a case by case basis. *M.S.R.*, 174 Wn.2d at 21–22.

### A. Child's Private Interest at Stake

The first *Mathews* factor requires weighing the private interest at stake. *Mathews*, 424 U.S. at 335. As our Supreme Court has noted:

> In a dependency or termination proceeding, the parent is at risk of losing the parent-child relationship, but the child is at risk of not only losing a parent but also relationships with sibling[(s)], grandparents, aunts, uncles, and other extended family.

*M.S.R.*, 174 Wn.2d at 15.

JA argues that the juvenile court erred in finding that JA's private interest was "'not that great'" in both the motion for appointment of counsel and in the subsequent motion for reconsideration. Br. of Appellant at 18 (quoting CP at 541 (Conclusion of Law (CL) 3)). JA's argument fails as to the juvenile court's denial of his motion to appoint public counsel, however, we reverse the court's later ruling that the new evidence presented in support of JA's motion for reconsideration did not change the weight given to JA's private interests.

Under RCW 13.34.030(6), a "[d]ependent child" means any child who:

(a) Has been abandoned;
(b) Is abused or neglected . . .;
(c) Has no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development.

Dependencies serve "the important function of allowing state intervention in order to remedy family problems and provide needed services." *In re Dependency of Schermer*, 161 Wn.2d 927, 942, 169 P.3d 452 (2007).

Recognizing that the family unit is a fundamental resource of American life, the legislature has declared that the family unit should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized. RCW 13.34.020. In a dependency proceeding, therefore, a child's health and safety are of paramount concern and a child has the right to a safe, stable, and permanent home and a speedy resolution of the proceeding. RCW

13.34.020. And in light of the continuous nature of a dependency proceeding, a child's fundamental liberty interests are at stake, not only in the initial hearing, but also in the series of hearings and review proceedings that occur as part of a dependency proceeding once a child comes into state custody. *Kenny A. ex rel. Winn v. Perdue*, 356 F. Supp. 2d 1353, 1360 (N.D. Ga. 2005).

A foster child also has a substantive due process right "to be free from unreasonable risk of harm . . . and a right to reasonable safety." *Braam v. State*, 150 Wn.2d 689, 699, 81 P.3d 851 (2003). A child faces the loss of physical liberty if the child is "physically removed from the parent's home" and may face the "daunting challenge" of being placed in the custody of the State as a foster child, forced to move from one foster home to another. *M.S.R.*, 174 Wn.2d at 16. Foster home placement may result in multiple changes of homes, schools, and friends over which the child has no control. *M.S.R.*, 174 Wn.2d at 16. Such movement from one foster home to another may cause children significant harm. *Braam*, 150 Wn.2d at 694; RCW 74.13.310. In a dependency proceeding, a child also faces the risk of being returned by the State to an abusive or neglectful home. *M.S.R.*, 174 Wn.2d at 17.

A dependency proceeding also affects a child's fundamental liberty interest in "having the affection and care of his parents." *Moore v. Burdman*, 84 Wn.2d 408, 411, 526 P.2d 893 (1974). A child has a strong liberty interest in the parent-child relationship that is equal to or greater than that of parents. *M.S.R.*, 174 Wn.2d at 17-18. And, a child has the right to freedom of personal choice in matters of family life, a fundamental liberty interest protected by the due

process clause of the Fourteenth Amendment.[26] *In re Dependency of T.R.*, 108 Wn. App. 149, 154, 29 P.3d 1275 (2001). Further, in a dependency proceeding, a child is at risk of not only losing a parent but also relationships with other family members. *M.S.R.*, 174 Wn.2d at 15 (citing *In re Custody of Shields*, 157 Wn.2d 126, 151-52, 136 P.3d 117 (2006)).

Although children have no constitutional right to State intervention to protect them from their own parents, once the State does intervene, as in a dependency proceeding, such rights attach. *M.S.R.*, 174 Wn.2d at 17 (citing *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 201, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989)). Thus, a child's fundamental liberty interests are at stake, not only in the initial deprivation hearing, but also in the series of hearings and review proceedings that occur once a child comes into state custody. *Kenny*, 356 F. Supp. 2d at 1360. These rights by their very nature are substantial private rights of a child, which a dependency proceeding puts at risk, even while the State endeavors to protect those same interests as best it can under the particular circumstances.

Before denying JA's initial motion for appointment of counsel on March 21, 2013, the juvenile court spoke with JA directly and asked why he was in court; JA responded that he wanted an attorney and that he wanted to go home with his mother. Understanding that JA wanted to go home with his mother, the court found, however, that she was not capable of caring

---

[26] U.S. CONST. amend. XIV.

for him and that guardianship was in his best interest.[27] Noting that JA could adequately express his desires on his own, the juvenile court denied his request for appointed counsel, reasoning that JA's private interests (in permanency and in maintaining a relationship with MB) were "not that great"[28] because (1) reunification with his mother was not available at the time; (2) JA was in a safe placement with a caregiver who was willing to serve as his guardian; and (3) JA felt safe at his foster home and liked where he lived.

A few weeks later, however, JA discovered new evidence that undercut critical facts on which the juvenile court had based its denial of appointment of counsel and that called into question whether JA's private interests remained protected without appointment of counsel: JA's foster mother wrote a letter to the court stating she did not "wish to assume guardianship" and that she believed JA should be with his mother. CP at 555. JA learned that his father was being released from prison and wanted to be a part of his life after release, which greatly concerned JA because, according to JA, his father "is not safe for me at all." CP at 556. And the juvenile court learned that from the day after its denial of JA's request for counsel, March 22, through March 25, JA had spent three "terrif[ying]" days in juvenile detention because he had a "meltdown" in his foster home. VRP (May 9, 2013) at 26. According to the GAL, JA's foster

---

[27] The juvenile court noted, for example: (1) the numerous times that MB had not been present for JA's dependency and permanency plan hearings; (2) MB's noncompliance with her court order and failure to show progress toward becoming able to serve effectively as JA's parent, as demonstrated at the September 13, 2011 review hearing, the February 13, 2012 permanency hearing, and the July and December 2012 dependency reviews; and (3) that at the March 21, 2013 hearing, when the court asked JA who the GAL was, JA's face had "'lit up,'" expressing happiness, and that had when the court asked JA who Rion was, JA's face had again "'lit up'" as JA explained that Rion Tisino was his social worker (his fourth). CP at 575.

[28] CP at 575.

home was "supposed to have services around this home to assist with [his] behavior," and JA "should not be spending any time in a facility that houses criminals." VRP (May 9, 2013) at 25.

These changes in circumstances affected JA's private interests in the following ways: (1) The juvenile court's initial determination that JA was "in a safe placement at this time with a caregiver who is willing to serve as his guardian"[29] was no longer true; (2) the safeguards that the juvenile court believed were in place did not protect JA from unreasonable risks of harm, such as his sudden, inappropriate, terrifying, and potentially avoidable confinement in juvenile detention; and (3) JA's right to reasonable safety was also newly compromised by the imminent release from prison of his father, who had a history of abusing JA and wanted to reinstate a relationship with him. This new evidence demonstrated that JA's interests were not being protected in the manner the juvenile court had assumed when it had denied his request for counsel two weeks earlier.

Contrary to the juvenile court's ruling, this new evidence of changed circumstances also changed the nature and weight that it should have given JA's private interests when it considered his motion for reconsideration. *See Braam*, 150 Wn.2d at 699. And this new evidence undermined the juvenile court's original order, which had been predicated on JA's private interest in permanency and on the court's understanding that JA's foster parent was willing to serve as his guardian. Thus, the record fails to support the juvenile court's ruling on reconsideration that this new evidence did not change the weight to be given to JA's private interests.

---

[29] CP at 575.

24

### B. Risk of Error

The second *Mathews* factor is the risk of erroneous deprivation of the child's rights under procedures currently in place and the value of additional procedures sought, which here, was appointment of counsel for JA. *M.S.R.*, 174 Wn.2d at 18. Both the United States Supreme Court and our Washington State Supreme Court have said that this factor

> depends on the legal and factual complexity of the situation and on the parties' ability to present their cases. . . . By extension, whether there is a constitutionally significant risk of an erroneous deprivation of rights may also turn on whether there is someone in the case who is able to represent the child's interests or whose interests align with the child's.

*M.S.R.*, 174 Wn.2d at 18 (internal citations omitted) (citing *Lassiter*, 452 U.S. at 30 and *Bellevue Sch. Dist. v. E.S.*, 171 Wn.2d 695, 704–05, 709–10, 257 P.3d 570 (2011) (little risk of erroneous deprivation of child's rights by absence of counsel at initial truancy hearing)).

JA argues that in weighing this second *Mathews* factor, the juvenile court understated the risk of error and failed to take into account the significant change in his permanent placement options, thus misapplying this factor. Again, we agree with JA that the juvenile court erred in ruling that the new evidence JA presented in support of his motion for reconsideration did not change the risk of error in the dependency proceedings. As the *M.S.R.* court held, the juvenile court makes the decision to appoint counsel for a child on a case-by-case basis using the *Mathews* test. *M.S.R.*, 174 Wn.2d at 22. The issue here therefore is whether the trial court's denial of JA's request for counsel put JA at risk of erroneous deprivation and if there is value added in appointing an attorney for JA in his dependency proceedings. Here, this second *Mathews* factor echoes many of the considerations relevant to the first factor that we have just explained in the preceding section of this analysis.

Because a case-by-case analysis allows wide room for judicial discretion, subjective determinations can magnify the risk of erroneous fact-findings. *Kenny*, 356 F. Supp. 2d at 1361 (quoting *Santosky v. Kramer*, 455 U.S. 745, 762, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)). This risk is especially heightened in dependency proceedings, which have no set end date, are constantly changing personnel, and involve numerous diverse issues affecting a child's life on an ongoing basis. *Kenny*, 356 F. Supp. 2d 1353 at 1360-61. Given the ongoing nature of dependency proceedings, and the multiple hearings and reviews to which a child is subject, there is a heightened risk of error; and, there is value added in appointing a child an attorney in a dependency proceeding to represent the child's best interests. *See Kenny*, 356 F. Supp. 2d at 1361.

For example, judges, GALs, and court appointed special advocates (CASAs) do not always adequately mitigate the risk of such errors. *Kenny*, 356 F. Supp. 2d at 1361. Judges, unlike child advocate attorneys, cannot conduct their own investigations and are entirely dependent on others to provide them information about the child's circumstances. *Kenny*, 356 F. Supp. 2d at 1361. Nor can GALs and CASAs always adequately mitigate the risk of such errors. *Kenny*, 356 F. Supp. 2d at 1361. For example, although a GAL represents the best interests of the child for whom he or she is appointed, such representation of the child's best interests "may

be inconsistent with the wishes of the person whose interest the guardian ad litem represents."[30] GALR 2a.

GALs and CASAs are different from attorneys in their representations of a child. *In re Dependency of M.S.R.*, 174 Wn.2d at 21 ("[w]e recognize the different, important, and valuable roles of GALs, CASAs, and counsel to children in dependency and parental termination proceedings"). Although a GAL can represent a child in a dependency proceeding, GALs and CASAs are not "trained to, nor is it their role to, protect the legal rights of the child." *Id.* Unlike GALs or CASAs, lawyers maintain confidential communications, may provide legal advice on potentially complex and vital issues to the child, and are bound by ethical duties. *Id.* Lawyers can assist the child and the court by explaining to the child the proceedings and the child's rights, and by articulating the child's views to the court, especially important for an older child (as compared to an infant) or to a child with a disability.[31] *Id.* at 21-22.

Here, in denying JA's initial request for counsel, the juvenile court determined that the risk of error of not appointing an attorney was low because JA had demonstrated his ability to speak directly to the court, appeared to have a team of social workers working with him, and had a GAL whose role was to advise the court, at every hearing, of JA's wishes. Recognizing that he

---

[30] Washington's Guardian ad Litem Rules, GALR 2(a) provides:

> A guardian ad litem shall represent the best interests of the person for whom he or she is appointed. Representation of best interests may be inconsistent with the wishes of the person whose interest the guardian ad litem represents. The guardian ad litem shall not advocate on behalf of or advise any party so as to create in the mind of a reasonable person the appearance of representing that party as an attorney.

[31] *See also* brief of amicus curiae, Disability Rights Washington, at 17-18, noting that when a child has a disability, the risk of error is higher without representation by counsel.

was not an attorney but declaring that he was "looking at what is in [JA]'s best interest," the GAL nevertheless (1) consistently opposed JA's wish to be reunited with his mother from the first hearing on; (2) opposed JA's request for appointment of counsel; (3) opposed reunification because JA's parents had been incompliant throughout the dependency action, they were not "making progress," and MB was unable to care for JA given her history of physical abuse, neglect, and mental health concerns of bi-polar, depression, and anxiety; and (4) instead, recommended a permanent plan of Title 13 "Guardianship". CP at 444.

But, as we previously explained, circumstances changed significantly after the juvenile court's original denial of JA's request for counsel, bringing into question whether the risk of error was low in JA's dependency proceedings, as the juvenile court had previously ruled. For example, during the May 9 permanency planning review hearing, JA's GAL reported that JA had spent three nights in juvenile detention because he had a "meltdown" and because he had been verbally abusive to Mora, leaving her with "no choice but to call law enforcement because she did not get the support from her private agency." VRP (May 9, 2013) at 25. As the GAL noted, JA's BRS foster home was "supposed to have services around this home to assist with [JA]'s behavior." VRP (May 9, 2013) at 25.

Furthermore, JA's three-day juvenile detention "bother[ed]" his GAL because

[JA]'s not a criminal. And it just, it just bothers me that, you know, if CCS tells a foster parent that they're not available and they're going to be there in two hours, then they should have picked [JA] up on the 22nd from detention and, you know, within two hours, and then address his, his individual needs. But no, they waited until the 25th. And they didn't even release him to CCS; they released him back to his foster parent. And, you know, that's concerning because he was terrified. [JA] told me he didn't like detention.

VRP (May 9, 2013) at 25-26.

In addition, there was an unresolved breakdown in communication and a lack of information provided to JA's GAL, who asked "the court to maybe instruct [DSHS] as to why they're not providing the State nor [the GAL] the information . . . requested several times in meetings." VRP (May 9, 2013) at 27. When the juvenile court asked for further information about JA's detention, the CCS service director said he did not have such information but could get it for the court. Even the juvenile court noted that (1) there was "a lot of miscommunication,"[32] (2) the court was not getting all the information the court requested from CPS, and (3) it hoped for "a little better responsiveness" in obtaining information such as JA's file review, visitation notes, and mental health notes. VRP (May 9, 2013) at 30.

These communication breakdowns, especially those concerning JA's detention, caused harm to JA: The detention deprived JA of his liberty for a longer period than necessary and appeared to have caused him emotional harm. JA's GAL believed that this detention "terrified" JA. VRP (May 9, 2013) at 26. This incident demonstrates the compelling risk of error that existed at the time of JA's reconsideration hearing. Despite his existing "team of social workers,"[33] the GAL, and the "several lawyers already on the case,"[34] which the juvenile court initially believed would protect JA from a risk of error, it was apparent by the time of the reconsideration hearing that this team had failed to protect JA from inappropriate detention,

---

[32] VRP (May 9, 2013) at 31.

[33] CP at 575 (CL 6).

[34] CP at 575 (CL 6).

especially its three-day duration following his initial incarceration.[35] Thus, the record does not support the juvenile court's ruling that the risk of error to JA remained unchanged after the first motion hearing. And we hold that the juvenile court erred in refusing on this basis to appoint counsel for JA under the statute.

## C. Government Interest

JA argues that the juvenile court also misapplied the third *Mathews* factor when it incorrectly found that the State has a greater interest in avoiding the cost of appointing counsel for him than in protecting his interests. DSHS counters that the State's interest does not weigh in favor of appointment of counsel because it increases costs to counties and creates an administrative burden for implementation. Under the circumstances of this case, we disagree with DSHS and agree with JA.

The third *Mathews* factor requires a court to weigh the State's interest in the proceeding, including fiscal and administrative burdens, against the State's interests in ensuring that a child's safety and well-being are protected. *Kenny*, 356 F. Supp. 2d at 1361; *see also Mathews*, 424 U.S. at 335; *M.S.R.*, 174 Wn.2d at 14. The State "has a compelling interest in both the welfare of the child and in 'an accurate and just decision' in the dependency and termination proceedings." *M.S.R.*, 174 Wn.2d at 18 (quoting *Lassiter*, 452 U.S. at 27)). Under the *Mathews* factors, financial cost alone is not controlling in determining whether due process requires a particular procedural safeguard prior to some administrative decision; moreover, the cost to society may outweigh the benefit of an additional safeguard to the individual affected by the administrative

---

[35] In contrast, appointed counsel for JA could have resolved the ongoing communication breakdowns and served as a resource for JA to ameliorate detention.

action. *Mathews*, 424 U.S. at 348.[36] RCW 13.34.100(6) does not specify criteria for weighing the expenditure of public funds for appointed counsel for a child in a dependency proceeding; thus, the *Mathews* factors are helpful in weighing the relative costs and benefits under our legislature's statutory provision for counsel in dependency proceedings, such as the one here.

We further note that JuCR 9.2(c)(1)[37] (1) *requires* appointment of counsel on the request of any party, or the court's own initiative, if the child does not have an appointed GAL or CASA, and (2) even allows appointment of counsel for a child for whom the court has already appointed a guardian ad litem. We cite this rule, not because it requires appointment of counsel for JA here, but rather as another example in which our State recognizes the importance of appointment of counsel for children in certain situations.[38]

---

[36] "Significantly, the cost of protecting those whom the preliminary administrative process has identified as likely to be found undeserving may in the end come out of the pockets of the deserving since resources available for any particular program of social welfare are not unlimited." *Mathews*, 424 U.S. at 348.

[37] JuCr 9.2(c)(1) provides:

> Upon request of a party or on the court's own initiative, the court shall appoint a lawyer for a juvenile who has no guardian ad litem and who is financially unable to obtain a lawyer without causing substantial hardship to himself or herself or the juvenile's family. The ability to pay part of the cost of a lawyer shall not preclude assignment. A juvenile shall not be deprived of a lawyer because a parent, guardian, or custodian refuses to pay for a lawyer for the juvenile. If the court has appointed a guardian ad litem for the juvenile, the court may, but need not, appoint a lawyer for the juvenile.

[38] *See also* the Washington Supreme Court's recitation of JuCR 9.2(c)(1) in noting that whether existing procedures are significant and whether an additional lawyer for the child in parental termination proceedings would reduce the likelihood of an erroneous decision "is subject to debate and has not been established here." *M.S.R.*, 174 Wn.2d at 19.

In denying JA's motion to reconsider appointment of counsel, the juvenile court ruled that JA's private interest and risk of error remained unchanged from the circumstances it had considered two weeks earlier when it denied JA's original request for appointment of counsel. As we have similarly explained in the preceding sections of this analysis addressing the other two *Mathews* factors, the record does not support the juvenile court's ruling that the countervailing government interest outweighed protection of JA's interest by appointment of counsel under the particular circumstances here, despite the court's recognition of limited resources for attorneys for children in this county.

As we have previously noted, after the juvenile court's denial of JA's request for appointment of counsel, JA's private interests and the risk of error markedly changed: (1) Mora was no longer willing to be his guardian, as the court had previously believed, and instead urged the court to place JA with his mother; (2) JA's father, who had been abusive to JA in the past, was soon to be released from prison and wanted to reestablish contact with JA; (3) JA's team of social workers had significantly miscommunicated information, leading to JA's three-day juvenile detention; and (4) according to the GAL, JA had been terrified and had suffered emotional harm while in detention. We hold that in light of these circumstances, the interest in protecting JA far outweighed any administrative or fiscal burden that appointment of counsel for JA might have entailed. *See Kenny*, 356 F. Supp. 2d at 1361.

No. 45134-4-II

Accordingly, we reverse the juvenile court's denial of JA's motion for reconsideration, and we remand for appointment of counsel for JA for his dependency hearing.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Hunt, P.J.

We concur:

Worswick, J.

Melnick, J.

33